**GWINNETT COUNTY SCHOOL DISTRICT Plaintiff**

v.

**J.B., By and Through her parents, D.B. and W.B. Defendant**

**No. CIV. 103CV384ODE.**

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 21, 2005.

E.L. Victoria Sweeny, Thompson & Sweeny, Elizabeth Ann Fisher Kinsinger, Thompson & Sweeny, Lawrenceville, Charles L. Weatherly, Sr., Julie Jennings Weatherly, The Weatherly Law Firm, Atlanta, GA, for Plaintiffs.

Jonathan A. Zimring, Dawn R. Smith, Zimring & Smith, Atlanta, GA, for Defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This civil suit under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq. and § 504 of the Rehabilitation Act of 1973 (" § 504"), 29 U.S.C. § 794, is before the Court on Plaintiff, Gwinnett County School District's ("School District") Motion for Partial Summary Judgment [# 37], Defendant/Appellee, J.B.'s ("J.B.") Motion for Partial Summary Judgment [# 35 & # 40], J.B.'s Motion in the alternative for the Admission of Additional Evidence [# 41 &

# 62], and the School District's Motion to file a Response to J.B.'s Notice of Supplemental Authority [# 55]. For the following reasons, Defendant's Motion for Partial Summary Judgment and Plaintiff's Motion for Partial Summary Judgment are DENIED; Plaintiff's Motion for Relief to File a Response Brief is GRANTED; and Defendant's Motion for Admission of Additional Evidence is GRANTED IN PART and DENIED IN PART.

## I. Legal Framework

The IDEA was enacted to ensure that school districts provide "children with disabilities ... a free appropriate public education ..." 20 U.S.C. § 1400(d)(1)(A). It provides a "basic floor of opportunity," consisting of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 201, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In order to offer a free appropriate public education, an Individualized Education Program Team ("IEP Team") develops an Individualized Education Program ("IEP"). *See* 20 U.S.C. § 1414(d)(1)(B). The IEP Team consists of "(i) the parents of a child with a disability; (ii) not less than 1 regular education teacher of such child ...; (iii) not less than 1 special education teacher ...; (iv) a representative of the local education agency ...; (v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi); (vi) at the discretion of the parent of the agency, other individuals who have knowledge or special expertise regarding the child ...; (vii) whenever appropriate, the child with a disability." *Id.* An IEP is "a written statement for each

child with a disability that is developed, reviewed, and revised in accordance with [the IDEA]." *Id.* at § 1414(d)(1)(A). It must "meet[ ] all requirements of the IDEA and state law, including [the rules promulgated by the Georgia Department of Education]" and must place the child in the Least Restrictive Environment. Ga. Comp. R. & Regs. 160–4–7–.01(3)(f). School districts must ensure that the IEP "is implemented as soon as possible" following the conclusion of the IEP meetings. 34 C.F.R. 300.342(b)(1)(ii).

■ In *Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690, the United States Supreme Court set forth a two-pronged inquiry for determining whether a State has provided a free appropriate public education: "First has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206–07, 102 S.Ct. 3034. With respect to the first prong—procedural violations—the United States Court of Appeals for the Eleventh Circuit has consistently required a showing of harm flowing from the procedural violations.[1] *See Weiss v. Sch. Bd. of Hillsborough County,* 141 F.3d 990, 996 (11th Cir.1998) ("For the Weisses to prove that Samuel was denied a [free appropriate public education], they must show harm to Samuel as a result of the alleged procedural violations. Violation of any of the procedures of the IDEA is not a *per se* violation of the Act."); *Doe v. Alabama,* 915 F.2d 651, 663 (11th Cir.1990) ("[T]he school's violation of the letter of the requirement does not require relief where, as here, the parents fully participated in the IEP process and there was no harm flowing from the procedural violation.").

---

1. Effective July 1, 2005, Congress revised the IDEA to reflect the Eleventh Circuit's requirement of harm. *See* 20 U.S.C.A. § 1415(f)(3)(E)(ii) (2005).

Therefore, to successfully seek compensation flowing from a procedural violation of the IDEA, one of the following two types of harm must be proved: (1) failure to provide educational benefit or (2) restriction of the parents' ability to participate fully in their child's education. *Collier County Sch. Bd. v. K.C.*, 285 F.3d 977, 982 (11th Cir.2002); *see also Weiss*, 141 F.3d at 997.

## II. Undisputed Facts Presented at the Administrative Hearing

At the time the IEP in question was developed, J.B. was a nine year-old girl with athetoid cerebral palsy and thus was eligible for services under the IDEA. She cannot walk without a walker and a personal assistant, and even with this support, she cannot walk long distances. J.B. is confined either to a wheelchair or her "work chair" for the majority of the day. She has extreme difficulty coordinating and controlling her hand movements, "significantly impacting her ability to access assistive technology used in school with accuracy and adequate speed." Joint Ex. 268. She has "significant difficulty with self-feeding, dressing, hygiene, and fine motor skills." *Id.* She also has trouble articulating, but for those who are accustomed to her speech patterns, she is intelligible.

J.B. has average intelligence and can participate in the regular classroom setting. With the help of assistive technology, which includes computer programs and joystick technology, she is able to do the same assignments as her nonhandicapped peers (although often not in the same volume because it takes her longer to complete tasks). She requires specialized instruction, but she has consistently been educated with her nonhandicapped peers.

J.B. and her family are residents of Gwinnett County. J.B. has never enrolled in any of the School District's schools, although her parents and the School District met and developed IEPs on at least two other occasions in 1998 and 2000. On each occasion D.B., J.B.'s mother, rejected the School District's IEP and opted for private school.

In late 2001, D.B. contacted the School District about formulating an IEP for J.B. On November 13, 2001, D.B. and the School District held a reevaluation conference[2] to reassess J.B.'s abilities and needs. In accordance with that conference, the School District administered the Wechsler Individual Achievement Test II on December 17, 2001 and began reviewing J.B.'s educational records as provided by D.B. The School District then met with D.B., along with D.B.'s advocate and J.B.'s private paraprofessional ("parapro")[3] on three separate occasions on March 1, April 19, and May 17, 2002 to develop an IEP for the 2002–03 school year.[4] The IEP document was developed over those three meetings and contained, in relevant part, the following services:[5]

---

2. Because D.B. had attempted to place J.B. in Gwinnett County schools with an IEP at least twice before, J.B. had already been evaluated a number of times. Thus, this was a re-evaluation conference.

3. The IEP Team was comprised of D.B. and her advocate, J.B.'s private parapro, and members of the School District staff, which included Dr. Elizabeth Garrett, Dara Dunnett, Susan Benjamin, Patricia Stuart, and Gina Burns.

4. These IEP meetings were taped and the Court has the partial transcripts of the first and third meetings and the full transcript of the second meeting. The transcripts were introduced into evidence at the ALJ hearing. The Court intends to rely on these transcripts in ruling on the parties' motions.

5. The Court endeavors to reproduce this document verbatim, so any grammatical errors, omissions of words, or sentence fragments are intentional. Words in bold denote stan-

*Recommended Special Education Program(s):*
Program Area(s)                                          **Hours/Week**
Orthopedic Impairment Program                            10 hrs/wk
Speech                                                   1 hr./week

*Recommended Related Service(s):*
Service(s)                                               **Hours/Week**
OT [occupational therapy]                                1/week
PT [physical therapy]                                    20 hrs year

*Hours/Week in Regular Education Settings:* 30 with support of [orthopedic impairment] program

*Transportation:* Special—Lift access to bus & support for seating

**Explanation of extent to which student will *not* participate with non-disabled students in the regular classroom:** The student demonstrates skills at a 3rd grade level according to her private school reports. Based on this information the committee recommends placement in general education.

. . .

*Special Considerations Discussed:*

**Supplemental aids and services.** Assistance with eating, transfer (full assistance), personal care, manipulating materials, travel * see addendum by a staff member

**Program modifications or supports for school personnel.** Fully trained in assistive technology, alternative augmentative communication, positioning, handling, academic curriculum, and emergency evacuation pro [copy is cut off]

**Assistive technology devices and services.** We will use the array of assistive technology reported as successful by parent as a basis for amending previous [School District] technology plan. (See addendum)

. . .

**Extended School Year (ESY) required.** No [checked] **Will meet to consider ESY by (date):** 9 weeks after commencement of school 9/23/02.

**Parent Concerns. (See also Staffing Minutes.)** Parent expects a dedicated paraprofessional to support [J.B.] with the following skills: educational background; trained in all areas of positioning handling, equipment, assistive equipment. She has concern regarding reduced hours of OI compared to previous IEP. Resolved 5/17/02 [D.B.] emphasizes the need to have a plan in place to back up assistive technology to assure continuous access to education.

. . .

**Modification/Intervention Plan**

. . .

**Classes:** All academic areas

dard items on the IEP form itself; words in regular type denote handwritten entries at the IEP meetings made by School District staff; words in brackets are the Court's comments or explanations.

The following modification/interventions may be necessary for this student to be successful in your class/program.

[This form was a box-checking form, and items that the IEP Team selected are denoted by check marks]

*Academically Related*
√ supplemental materials
√ study sheets
√ waive time constraints
√ peer assistance
√ scheduled breaks
√ preferential seating
√ auditory/visual
   lower/higher level material
√ task/assignment sheet
√ highlight skills
   tests read to student
√ **Other:** oral administration
of tests.
Assign tasks on an appropriate
reading level.
Books scanned in laptop to
enlarge print.
No timed tests.
Assistance needed in
manipulating materials.
Recordings for blind & talking
books.

√ adult proximity for physical
   assist in general ed &
   special ed
√ note taking aids
√ reduce task (number)
√ reduce task (length)
√ adult assistance
   isolated area
√ small groups
√ equipment
√ alternative test
   contact
√ **multiple choice tests vs.**
   **essay**
√ **adjusting physical learning**
   **environment**
● Allow for spelling errors
   in subjects other than
   spelling.
● Allow [J.B.] to use
   manuscript.
● Avoid pressures of speed
   and accuracy.
● Accept key word responses
   instead of complete
   sentences.
● decrease visual clutter

*Behaviorally Related:*
√ adult proximity
√ preferential seating
   isolated area
√ alternative schedule
– Provide desk for
paraprofessional next to
[J.B.]'s desk in every
location as needed
– Adapted chair for each
classroom that she will
[copy is cut-off]

   contract
√ **reinforcement**
   **management system**
√ **environment**
√ **other:**
– Provide opportunities for
   movement

– Print enlargement

[End of reproduction]

Joint Ex. 4–6. On the back of the page titled "Modification/Intervention Plan," the IEP Team added the following:

   "widened aisles," "work surface modifications," "material needs to be specially positioned," "need homeroom near an exit," "special bathroom accommodations."

Tr. Nov. 4, 2002, p. 164. These provisions appear almost verbatim on the list of requests that D.B. brought to the first IEP

meeting. *See* Joint Ex. 274. The last three pages of the IEP consisted of "IEP Goals and Objectives," which included that "[J.B.] will . . . maintain appropriate transfer, walking, and travel skills." *Id.* at 8.

Over the course of the first two IEP meetings, the School District created two addenda to include services that would not fit on the IEP forms; indeed, the IEP states "see addendum" twice, referring to these documents. The addenda were based, in large part, on a list of requests that D.B. brought to the IEP meetings. The School District uses the same forms to create addenda and keep minutes of IEP meetings, and staff are supposed to check the appropriate box to identify whether a particular page is an addendum or staff minutes. In this case, the staff member checked the two addenda as "staff minutes." The contents of the addenda minutes are reproduced below.[6] The first addendum dealt with assistive technology features:

### Assistive Technology

Parent reports current technology to include:

HB Laptop 451 large screen—multiple port feature

    ABC key alignment

    On Screen keyboard

    joystick

    magic cursor

    word prediction software

HP scanner

    WYNN 3

    Screen Doors 2000—word prediction

    Magic Cursor 2000

    Joystick—[illegible]

    Jellybean mouse function

Tray into Joystick Mount

Intellimathematics

Due to the reported success of assistive tech by parent, the team is recommending that the assistive technology plan which was developed by [the School District] be modified to include trials using the above equipment (or compatible devices/software)

EBG 3/1/02

[End of reproduction]

Joint Ex. 19. The second addendum provided for the following:

### Supplemental Aids & Services

— Seating in a chair that provides appropriate stability so that she may be seated @ a table/desk with peers and able to access AAC/assistive tech.

— space to facilitate walking with walker within the classroom

— desk next [sic] [J.B.] for the paraprofessional

— accommodations in place for her [sic] eat with her class in the lunchroom

— Full physical assistance for transfers and walking in the classroom

— assistance with personal care

— assistance eating

— assistance with emergency procedures

— format of classroom materials accommodated to allow alternative presentation of material to address motor impairment & visual tracking difficulties (see assistive technology plan for strategies re: scanning—in addition to reducing visual complexity, type of response (multiple choice vs. fill in the blank) mode of response-dictation, etc)

[End of Reproduction]

*Id.* at 21.

---

**6.** The Court endeavors to reproduce this document verbatim, so any grammatical errors, omissions of words, or sentence fragments are intentional.

At the conclusion of the second IEP meeting on April 19, 2002, the IEP was not complete because the School District and D.B. still had two issues to discuss: (1) transportation and (2) the amount of support J.B. would receive from the orthopedic impairment program. The School District photocopied the still-incomplete IEP at D.B.'s request and also gave her a copy of the two addenda. The photocopied IEP did not include the added provisions on the back of the "Modifications/Intervention Plan" page mentioned above.

The third IEP meeting on May 17, 2002 focussed on issues of transportation, hours in the orthopedically impaired program, and paraprofessional assistance. D.B. expressed concern that certain services provided in J.B.'s 2000 IEP were significantly reduced in the 2002 IEP. Specifically, in 2000, J.B.'s IEP provided for thirty hours per week in the orthopedically impaired program, and the 2002 IEP essentially provided for only five hours per week in the orthopedically impaired program. D.B. insisted that J.B. needed one full-time, dedicated parapro, as opposed to randomly assigned parapros assisting her throughout the day. She explained:

> I feel sure they are quite qualified, but you have to realize that it's not the dependence that we're [ ] worried about, it's [J.B.] being comfortable and able to move forward academically in a meaningful way, and she will have to get comfortable with that person, and she has to feel safe, and she has to be able to communicate [ ] well with that person.

Tr. May 17, 2002, p. 3. Dr. Garrett, a School District representative and IEP Team member, did not commit to providing one dedicated parapro, and she listed D.B.'s request under "Parent Concerns" in the IEP. See supra, p. 1250.

The IEP team also discussed transportation at the third meeting. D.B. described how she transported J.B. to school:

> [D.B.]: [s]he needs a van. She sits in a booster seat and I use a regular seat belt. The wheelchair is in the back and I pull it out of the car and she gets in the wheelchair.
>
> E. Garrett: How does she get up?
>
> [D.B.]: She steps up. I walk her up, I facilitate her to the van, she takes that step up and I lift her onto the booster seat.

Pet'r Ex. 29, p. 7. D.B. believed that regular transportation provided opportunities for J.B. to socialize with her peers, that special transportation involved only a few students, and that it picked children up from school before school was over in the afternoon. Dr. Garrett explained that the School District could only offer special transportation: "The reality of the physics of getting [J.B.] safely on the bus means that she cannot travel up the steps by herself, she's going to have some mechanism. And our definition is a lift and our lifts are on the mini buses." Id. at 1251.

Finally, the IEP Team discussed physical therapy. D.B. described J.B.'s private physical therapy services: "I have a [physical therapist] that comes to school once a week that works with her one [on one], with walking, standing, sitting.... I don't think [the School District] can do it with twenty hours a year." Id. at 10. Dr. Garrett explained that "[i]solated [physical therapy] for 45 minutes of clinical intervention is not a school based model," id., and kept J.B.'s physical therapy allotment at twenty hours per year.

At the conclusion of the third IEP meeting on May 17, 2002, the School District gave D.B. another photocopy of the IEP. Like the photocopy after the second meeting, this photocopy did not contain the provisions on the back of the "Modifica-

tions/Intervention Plan" page. Therefore, D.B. had the body of the IEP and the staff minutes including the two addenda, but she did not have the provisions on the back of the Modifications/Intervention Plan. D.B. had neither accepted nor rejected the IEP at this point.

On May 29, 2002, D.B. wrote Mr. Mike Nelson, for the School District requesting mediation:

I write today in the spirit of cooperation to request a mediation and hopes to resolve several outstanding issues concerning [J.B.]'s Individual Education Plan (IEP).

There has been a dramatic drop in the number of hours of services from [J.B.]'s last IEP dates [sic] February, 2000, and I have not seen improvement in her disability to justify this reduction in services.

I believe without these services, [J.B.] will be unable to receive a meaningful education and will not be able to keep up with her peers academically, as she has in the past.

Prior to the mediation, please provide me with a complete copy of [J.B.]'s IEP ... I am eager to resolve this matter within the next few weeks.

Resp't Ex. 200.

On June 4, 2002, Mr. John Shaw, Due Process and Compliance Officer for the School District, wrote D.B. a letter regarding, in part, her request for mediation:[7]

[Y]ou have requested mediation for unspecified issues. Since I am unaware of any pending due process matters, I am unclear as to the purpose of mediation. I would be willing to schedule mediation at any time regarding any disputes between our agency and a parent, but I would first request the courtesy of a

reply indicating in reasonable detail the issues you would like to mediate.

Joint Ex. 283.

On June 6, 2002, D.B. wrote Mr. Shaw a letter regarding his letter of June 4:

I am little confused [sic] to your statement concerning my mediation request. I did not realize that a parent had to request an impartial due process hearing to afford the opportunity for mediation. As I stated in my previous letter to Mr. Kimbrough, I have a dispute involving the matter relating to her IEP, and that it does not provide [J.B.] with a free appropriate public education (FAPE). If I must request a due process hearing prior to mediation, please let me know immediately and I will file the request with the Superintendent's office and the Georgia DOE's office. I find it a little disturbing that when a parent request [sic] mediation to resolve a matter, the parent must provide detailed information before the District will decide to offer mediation to the parent. I feel that this goes against what mediation is about.

Finally, I need to again emphasize the urgency to these matters. August will be upon us and without an appropriate IEP, [J.B.] cannot receive FAPE.

*Id.* at 296–A.

On June 10, 2002, Mr. Shaw responded to D.B.'s letter:

I apologize for any confusion regarding our policy on mediation. To clarify, if a student or parent requests a due process hearing, then part of the legal procedure is to offer mediation to attempt to resolve the issues raised in the request for a hearing. If there is no request for a hearing, and the student or

7. Mr. Shaw's letter also acknowledged D.B.'s request for an independent evaluation of

reading achievement and information under the Georgia Open Records Act. Joint Ex. 283.

parent has issues, we will consider going to mediation on a voluntary basis with the student/parent to attempt to resolve the issues; however, as I indicated in my letter, we need to know what the issues are before we go to mediation. Prior knowledge of the issues allows us to make a determination of which staff members need to be present at the mediation, and which materials we need to review prior to mediation.

I hope this clarifies our position on mediation. We look forward to continuing to work with you as we endeavor to meet our obligations under the law for [J.B.]'s education.

*Id.* at 297. Mr. Shaw received a letter back from D.B.[8] and responded to that letter on June 18, 2002, writing:

[The School District] will agree to honor your request for mediation concerning the amount of services which the IEP Team developed at the last meeting. As you know, our position is that the team designed a program which offers [J.B.] a free and appropriate public education. We will, however, cooperate in scheduling mediation to review the team's recommendation and your requests to see if your concerns can be resolved without the necessity of going to a hearing. Accordingly, I will be contacting the appropriate authorities to have a mediator appointed, who should be in touch with you in the near future.

*Id.* at 298.

On July 29, 2002, D.B. wrote Mr. Shaw a letter stating that the proposed mediation dates were too late and rejecting the IEP:

I received a phone message from Ms. Whitehead concerning my mediation request on Friday afternoon, July 26, 2002. She provided me with dates for mediation during the week prior to the beginning of school.

I requested mediation in June hoping to resolve several issues that I raised at the last IEP meeting with Dr. Garrett, without resolve. These issues pertained to training, personnel, [J.B.]'s assistive technology, and the number of hours offered to [J.B.] compared to her last IEP.

All of these issues are crucial if [J.B.] is to receive a free and appropriate public education in the least restrictive environment.

Due to the delay in mediation, the District has left me with no choice at this time but to provide notice that I am rejecting the IEP that has been proposed by the District for [J.B.], and we will seek private placement.

Placing [J.B.] in school with the IEP that is in place now could result in serious emotional harm, as well as physical harm to her.

I will contact Ms. Whitehead ... this morning with time and date [sic] that I will be available for mediation.

*Id.* at 284–85.

Mr. Shaw responded to this letter on July 31:

Our file reflects that we agreed to mediate the issues arising out of [J.B.]'s IEP and proposed placement for the fall on June 18, 2002, or approximately just over one month ago. During the last month, I have had several conversations with Ms. Whitehead ... attempting to find a mutually convenient time and date. It seems that either your schedule, or ours, did not permit this matter to be scheduled as quickly as we both initially desired. As a complicating factor, our teachers are nine month employees, and the teacher most familiar

---

8. D.B.'s letter is not in the record.

with this matter, Ms. Burns, was out of town for two weeks. I thought that ... we had an agreement that upon Ms. Burns' return to the country, we would immediately schedule a date for the meeting. Within a few days of her return, we called Ms. Whitehead with our proposed dates for the meeting which has now been scheduled for August 5, 2002.

In your letter you state that you "reject the IEP" and provide notice of your intention .to seek "private placement." We are unclear as to what you mean by the term "private placement" but assume that you have located a placement outside the program offered by the district for [J.B.]'s education, at your expense, which, of course, you have the right to do. If this is true, I am unclear as to the point of continuing mediation. We are still willing to meet on Monday, August 5, 2002, to attempt to amicably resolve the issues that we thought were initially the subject of mediation; i.e., training, personnel, assistive technology, and hours of services in the IEP.

Unless I hear from you to the contrary, we will be present in good faith at the scheduled mediation to attempt to resolve the issues described above, and look forward to seeing you there.

*Id.* at 299.

In the final letter between D.B. and the School District before mediation, D.B. wrote the following letter to Mr. Shaw on August 2, 2002:

I confirm that I will attend the mediation. My letter earlier did not alter my approach to mediation and I am hopeful that the parties will be able to reach an agreement that resolves the concerns I have with the program. offered my daughter.

I write to respond to the questions you had in your letter, so that we are clear about the situation. First, I simply do not agree with the implication of the time line of events of your letter. It may have been only June 18, 2002 when you agreed to mediation, but my request occurred earlier than that. I also understand that this mediation can be over any issues related to the program and IDEA, and that it is not only provided when a hearing is also requested. Georgia Department Rule 160–4–7–.16.[9]

My concern with the delay has been that there are issues concerning the training and preparation of staff which are in dispute. These particular issues cannot be resolved at mediation and implemented prior to the beginning of the school year, as there is not sufficient time. In the absence of an agreement and with the beginning of school approaching, my letter was sent to make sure that I protected my daughter and that the District had adequate notice of my objections. I therefore sent the letter as the District's Parental Notice form says I should send, to give notice of my further concerns (i.e., those from the delay) as supplemental to the concerns I had with the adequacy of services, and that I might provide services privately and seek reimbursement.

Georgia Department Rule 160–4–7–.115(2)(4). Perhaps the notice was not required because [J.B.] has not been in a

9. The Georgia Department of Education ("GDOE") Regulation D.B. cites and the accompanying federal regulation (34 C.F.R. 300.506) only require the local school system to "ensure that procedures are established and implemented to allow parties to disputes to resolve such disputes through a mediation process which, *at a minimum, shall be available whenever an impartial due process hearing is requested.*" Ga. Comp. R. & Regs. 160–4–7–.16 (emphasis added); 34 C.F.R. 300.506.

District program, but I was just trying to be straightforward with you and the District.

As you stated in your letter, I also will attend in good faith in an attempt to resolve all the issues raised concerning the programs, placement and procedures.

Joint Ex. 301–02.

The parties attempted to mediate on August 5, 2002. The discussions at the mediation are confidential and it is unclear who attended.[10] A letter from Mr. Shaw to D.B. on August 14, 2002, however, provides some insight into the discussions.[11]

We acknowledge your request for a due process hearing, and I am writing to advise you that your request has been reported to the Georgia Department of Education in accordance with the procedures governing this process.

In addition, I wish to confirm that our district remains prepared to resolve this matter with you as we discussed at mediation. Specifically, we have agreed to the following:

1. Placement at Suwanee Elementary School for thirty hours per week in the [orthopedically impaired] program. [J.B.] would attend regular education classes and would be assigned a trained paraprofessional who would accompany her. The paraprofessional would be supervised by a teacher in the [orthopedically impaired] program as well as a regular education teacher. At times, and when needed to support her educational program, the [orthopedically impaired] teacher would ac-

company [J.B.] to her regular education class.

2. The paraprofessional who currently works with [J.B.] under your employment would be paid at her present rate of pay to accompany [J.B.] to school for a period of four weeks to facilitate transitioning into the new school as well as to assist with training [J.B.]'s new paraprofessional with programming the assistive technology devices used by [J.B.] as well as to any other matters relative to [J.B.]'s education. If [J.B.]'s current paraprofessional is not available to fill this role, then another person would be designated to provide whatever training is necessary for a successful transition as well as the full implementation of the IEP.

3. The assistive technology that you requested at the IEP and listed on attachment 1 will be provided.

4. The modifications and accommodations that you requested on March 1, 2002 as listed on attachment 2 will also be provided, unless it has been lined through. As you will note, many of the items you listed are strategies that our teachers typically use.

5. An independent neuro-psychological evaluation up to a cost of three thousand dollars will be provided and paid for by the district, to be conducted by the Sheppard Center as you requested; provided that the school district receive a full copy of the evaluation within three business days of your receipt of the report and that you consent to the district's own evaluation, should we desire to do one

---

**10.** 20 U.S.C. § 1415(e)(2)(G) provides that "[d]iscussions that occur during the mediation process shall be confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding."

**11.** The attachments Mr. Shaw refers to in the letter are not attached to the Court's copy of the letter. The Court infers that these are the same requests appearing in Joint Exhibits 272–77.

after receipt of the independent evaluation.

Resp't Ex. 196–97.

In the final correspondence included in the administrative record, D.B. faxed Mr. Shaw a letter on August 16, 2002, rejecting the School District's proposal:

I regret to inform you that your letter was not consistent with what was discussed or actually offered at mediation. Also, I regret that this matter could not have been resolved earlier, and prior to my commitment to an alternate placement for [J.B.] and for which I now have contractual and binding obligation. I sincerely need to state that this proposal could have been one with which I could have worked with if offered to me at the IEP meeting several months ago. Nevertheless, it is still not complete nor does it provide a free appropriate public education.

Joint Ex. 303.

J.B.'s parents requested a due process hearing, which was held before Administrative Law Judge John B. Gatto ("ALJ") on November 4, 6, 7, 19, and 25, 2002.[12] J.B.'s parents enrolled J.B. at the Friends School in Decatur, Georgia for the 2002–03 school year.

III. Testimony of Witnesses at the Administrative Hearing

At the administrative hearing, the School District presented the testimony of four witnesses who were members of the IEP Team for J.B.'s IEP:[13] Dr. Elizabeth B. Garrett, Ms. Dara Dunnett, Ms. Susan Benjamin, and Ms. Patricia Stuart. J.B. did not call any witnesses. The ALJ ruled in favor of J.B. at the conclusion of the School District's case. The following is a summary of each witness's testimony.

1. Dr. Elizabeth Garrett

Dr. Garrett testified that she was the lead coordinator in the Department of Special Education at the School District and was qualified as an expert in "designing, implementing, and supervising educational programs for children with orthopedic impairment." Tr. Nov. 4, 2002, p. 68. She was present at all three IEP meetings.

a. Direct Examination

On direct examination, Dr. Garrett discussed the various services offered to J.B. in the IEP, describing the School District's commitments under the IEP and explaining the rationale behind the IEP Team's decisions. She testified that the services offered on J.B.'s IEP reflected the recommendations of J.B.'s private therapists. One hour per week of occupational therapy was consistent with what J.B. was receiving already from private sources, id. at 118; twenty hours per year of physical therapy was within the range that J.B. received privately, id. at 117; and one hour per week of speech services with emphasis initially on articulation accorded with J.B.'s private speech and language pathologist report, id. at 118–19. She explained further that D.B. was an active participant in the IEP discussions and that most of D.B.'s requests were incorporated into the IEP. She stated that after the third IEP meeting on May 17, 2002, all of the outstanding IEP issues were discussed and resolved. At that final meeting, D.B. told Dr. Garrett, "if I go to mediation, it will be about [physical therapy] hours."

12. The November 4, 6, and 7 dates involved the liability phase only; the issue of relief was addressed on November 19 and 25.

13. Pursuant to GDOE Regulation 160-4-7-.18(g)(8), the ALJ assessed the burden of proof against the School District to establish that the proposed IEP provided J.B. with a free appropriate public education.

*Id.* at 123. In Dr. Garrett's opinion, J.B.'s IEP was appropriate. *Id.* at 124.

b. Cross-examination

On cross-examination, Dr. Garrett agreed that D.B. was helpful and forthcoming in providing all the information the School District requested. Regarding physical therapy, occupational therapy, and speech and language therapy services, Dr. Garrett admitted to conducting no independent evaluations of J.B.'s needs in these categories; rather, the School District relied on reports from J.B.'s private therapists. Dr. Garrett also admitted to being aware of GDOE Regulation 160–4–7–.09(6)(a)(7), which prohibits the use of yearly ranges in specifying the frequency of IEP services; notwithstanding that regulation, the IEP provided for twenty hours per year of physical therapy. *Id.* at 176. Dr. Garrett's rationale for the yearly frequency was that J.B.'s physical therapy was designed to be more intensive at the beginning of the school year and to taper off as the school year progressed. Because the frequency of her physical therapy would be variable from week to week and month to month, it was expressed in terms of a yearly figure (twenty hours per year). This reflected D.B.'s and J.B.'s private parapro's statements that as J.B. mastered new exercises over time, she needed less help and could complete them faster. Dr. Garrett admitted that, instead of providing the yearly frequency, the IEP Team could have defined a weekly or monthly frequency for physical therapy and adjusted it as needed at an IEP Team meeting later in the school year.

Dr. Garrett admitted to other technical violations of the IDEA and implementing federal and state regulations. First, the School District's parental notifications for the second and third IEP meetings did not comply with 34 C.F.R. 300.345, because they only set forth general categories of possible School District attendees. Dr. Garrett's position was that D.B. more or less knew who was going to attend those meetings because virtually the same people attended the first meeting. Second, the School District did not send written notice to J.B.'s parents as required by 34 C.F.R. 300.503(b), explaining the rejection of D.B.'s request for (1) regular transportation services, (2) extended school year services in the summer before school, and (3) increased physical therapy services. In Dr. Garrett's opinion, no explanation was needed because the discussions at the IEP meetings, in which D.B. participated, served the same purpose.

Regarding the provision of a full-time parapro under the IEP, Dr. Garrett testified that J.B. would have had an "adult right next to her helping ... for every moment," *id.* at 268, and the IEP reflected that by providing for thirty hours of regular education "with support of the OI program." Joint Ex. 4. Dr. Garrett also stated she was surprised to learn from J.B.'s lawyer during cross-examination that D.B. "would say that that was never said at the IEP team meetings, and that when [D.B.] repeatedly asked for that commitment, she was told by [Dr. Garrett] and by others that there were problems with that commitment, and people continuously identified portions of the day when [J.B.] would not have an aide." Tr. Nov. 4, 2002, p. 268. Dr. Garrett "thought that the disagreement was about having the same person all day." *Id.*

Dr. Garrett was also cross-examined about extended school year services and the School District's commitment to J.B.'s assistive technology needs. The questions concerning extended school year services centered around the extent to which the School District discussed and considered them as required by GDOE Regulation

160–4–7–.09(3)(i)(1). Dr. Garrett admitted that the IEP Team did not discuss extended school year services for the summer of 2002, because "we didn't feel like they were required." Tr. Nov. 4, 2002, p. 221. Dr. Garrett explained the School District's policy regarding these services: "We look at … the progress and goals and objectives, and talk about whether progress has been made and use that as a basis—one of the ways to determine [extended school year services], and so in this case, we couldn't do that … on the day of the meeting because we had no current IEP objectives to evaluate progress on." *Id.* at 223. She testified that the IEP Team scheduled to reconvene after the first nine-week period of the 2002–03 school year to assess J.B.'s extended school year needs. The School District committed to providing Saturday school during the first nine weeks of school if J.B. needed it.

Regarding assistive technology, D.B. agreed to provide J.B.'s computer and other learning technology, but D.B. requested that the School District provide a back up system in case J.B.'s equipment crashed. Dr. Garrett admitted that the IEP mentioned the backup system under the heading "Parent's concerns" and the specific provisions for back up equipment only existed on an addendum. *Id.* at 247. On redirect, Dr. Garrett testified that all the items on that addendum had been purchased:

Q. If you would, look at those items that are listed there [on Joint Exhibit 19] and tell the Court what the School District did with respect to those items in planning for [J.B.]'s enrollment at Suwanee Elementary School?

A. We purchased those items.

Q. And where are they located today?

A. At Lawrenceville East in the Office of Special Education.

Q. Why are they not being utilized for another child?

A. We're holding them for [J.B.].

Tr. Nov. 4, 2002, p. 284.

When questioned about the staff minutes versus addenda issue, Dr. Garrett testified that she did most of the writing for each meeting. She agreed that "minutes" are intended to chronicle the IEP Team's discussions, and the IEP records the decisions and programs to be implemented. She also agreed that the School District's policy was that "minutes do not amend the IEP, and the IEP is the only enforceable document." *Id.* at 154. However, Dr. Garrett also stated that she would have honored the provisions in the addenda, regardless of whether they were denoted as minutes:

Q. And so when [D.B.] would come back to the meeting six months from then or spring of 2003, she could say to you, I thought it was going to occur here? And you could say to her, no, we said it would occur anywhere, right?

A. I would say to her, let's look at the minutes and see what we discussed, and in good faith, I would honor our discussion with her.

*Id.* at 186.

Finally, counsel for J.B. questioned Dr. Garrett about the portion of the IEP on the back of the "Modifications/Intervention Plan" page. D.B. did not receive this part of the IEP because the School District only photocopied the front of this page. Dr. Garrett conceded that those provisions were important to J.B.'s IEP, and that no one pointed out to D.B. that the copy of the IEP which she was given did not include them.

2. Ms. Dara Dunnett

Ms. Dunnett testified that she was a teacher of the orthopedically impaired at

Suwanee Elementary School. She earned her Bachelors degree in education at the University of Georgia, her Masters in special education from North Georgia College, and received certification to teach the orthopedically impaired from Georgia State University. She attended all three IEP meetings.

### a. Direct Examination

Ms. Dunnett, with the help of Ms. Benjamin, administered the Wechsler Individual Achievement Test to J.B. on December 17, 2001. D.B. and J.B.'s private parapro also attended the testing session. Upon completion, D.B. told Ms. Dunnett that she did not want any other subtesting done because Ms. Dunnett and Ms. Benjamin had done a thorough job. Ms. Dunnett also offered to conduct an occupational therapy and physical therapy evaluation to "better prepare for the IEP [meetings], and [D.B.] said that she would have her private [occupational therapist] and [physical therapist] prepare those for us and get those to us because it made sense to have someone who was familiar with [J.B.] do those assessments." Tr. Nov. 6, 2002, p. 304.

Ms. Dunnett testified that D.B. provided J.B.'s therapists' reports and brought two lists to the IEP meetings for discussion as well. The first list concerned "supplementary aids and services" and the second list contained "proposed modifications and accommodations." Id. at 306. She testified further that all D.B.'s materials were discussed. The "proposed supplementary aids and services ... were listed in the IEP almost verbatim," and "the modifications and interventions ... for the most part, [ ] were all entered into the IEP as well." Id. at 306–07.

Regarding occupational therapy, Ms. Dunnett stated that D.B. "agreed" with one hour per week; regarding physical therapy, Ms. Dunnett testified that the School District's physical therapist explained to D.B. the allocation of twenty hours per year, and D.B. "agreed with it." Id. at 310–11.

Ms. Dunnett also described the discussion among the IEP Team about parapro services. D.B. wanted one dedicated person to be J.B.'s parapro, and Ms. Dunnett explained the School District's reasons for sharing that responsibility with more than one parapro. "[The School District] feel[s] that it's better for the child to have—to be used to more than one person in the event that that person has an extended absence." Id. at 316.

Ms. Dunnett also recounted the discussion at the third IEP meeting about transportation. She said that D.B. wanted J.B. to ride regular transportation because D.B. "felt it would be beneficial from a social aspect." But, Ms. Dunnett testified that the majority of socialization at school occurs in the regular education classroom setting, not during transportation. Moreover, the School District believed it was safer in J.B.'s case to use special transportation, given her physical impairments.

Finally, Ms. Dunnett admitted responsibility for not copying the back side of the "Modifications/Intervention Plan" page. But, she also testified that D.B. was present when those entries were written on the back of the page.

### b. Cross-examination

The first subject of cross-examination involved Ms. Dunnett's miscopying of the IEP which left the back of the "Modifications/Intervention Plan" uncopied. In response to questions from J.B.'s counsel, she admitted that this happened after the second meeting when D.B. asked for a copy of the still-in-progress IEP, and after the third IEP meeting when the School

District gave D.B. the final copy of the IEP.

Next Ms. Dunnett was cross-examined on the School District's stated goal of "maintaining" J.B.'s skills, rather than improving, developing, or restoring as stated in the definition of "occupational therapy" at 34 C.F.R. 300.24(b)(5)(ii). Furthermore, counsel for J.B. emphasized the lack of specific goals, objectives, and baselines for achieving and measuring improvement. Ms. Dunnett's response was as follows:

A. We never limit ourselves to what an IEP says in our classroom. We always go above and beyond, and being specific would be wonderful but we never—we never limit things to a specific objective. We always go above and beyond what we write....

A. . . . [W]e always want the child to improve.

Tr. Nov. 6, 2002, pp. 351–55.

Ms. Dunnett was questioned about the discussion at the second IEP meeting in April concerning whether J.B. would receive full-time parapro support and whether this commitment was apparent from the face of the IEP. On direct, Ms. Dunnett asserted that the School District clearly intended to provide J.B. with full-time parapro support. J.B.'s counsel tested this assertion against what was said to D.B. at the second IEP meeting in April as reflected in the transcripts of that meeting.

Q. So [Dr. Garrett] was not saying that they were going to have a parapro come from the [orthopedically impaired program] all day; isn't that accurate?

A. I don't know what context this is.

Id. at 379–80. Ms. Dunnett explained that the IEP provided full-time parapro support on the face of the document:

Q. Now, this does not say 30 hours or 32.5 hours of [orthopedic impairment program] support. It is not specific as to see [sic] time; isn't that correct?

A. No, that's incorrect.

Q. Could you show me where it says 30 or 32 hours of aide support?

(Witness complies with request of counsel.)

Q. So hours per week in regular educational setting where it says 30 hours, you're saying than [sic] means -

A. With [orthopedic impairment program] support, we made that clear to mom, that she would have an [orthopedic impairment program] staff member with her at all times.

Id. at 376. However, later in the cross-examination, J.B.'s counsel asked, "Now, you also aren't sure that's what the 30 hours means; are you, ma'am?" Ms. Dunnett responded, "No. I'm not sure what I—what I was talking about there." Id. at 381. J.B.'s counsel also questioned Ms. Dunnett about the number of different parapros that would assist J.B. D.B. was adamant at the IEP meetings that one parapro be assigned to J.B. primarily because she communicated better with one person, and she was uncomfortable with multiple people helping her go to the bathroom. Ms. Dunnett testified that, although "it doesn't say it in the IEP," id. at 424, three parapros would be the maximum number of people assigned to J.B. Id. at 422.

3. Ms. Susan Benjamin

Ms. Benjamin testified that she was a teacher of the orthopedically impaired at Suwanee Elementary School and had twenty years of teaching experience. She has a masters degree and a certification to teach children with moderate and severe handicaps.

### a. Direct Examination

Ms. Benjamin observed J.B. at Christ Church Episcopal School, the school J.B. attended for third grade in 2001–02. She also helped Ms. Dunnett administer the Wechsler Individual Achievement Test in December 2001. She attended the first and second IEP meetings; she did not attend the third meeting.

Ms. Benjamin testified that she wrote "see addendum" on the IEP. She also wrote the contents of both addenda. She testified that "[a]s I was writing the information under what [J.B.] would need under supplementary aids and services, there was not enough room to finish writing in that space. So it was put on another piece of paper to be part of the IEP." *Id.* at 474–75. The second addendum for assistive technology was created for the same reason. The addenda reflected the list of requests that D.B. brought to the meeting. Near the end of the second meeting, Ms. Benjamin was dismissed from the discussions because it became apparent that J.B. would not enroll in Suwanee Elementary School until fourth grade, and Ms. Benjamin only taught up to third grade.

### b. Cross-examination

Ms. Benjamin was cross-examined on the administration of the Wechsler Individual Achievement Test to J.B. and D.B.'s request for the protocols for the test. Ms. Benjamin stated that "[w]e provide the test scores. We do not send the protocol of assessments." *Id.* at 500. J.B.'s counsel referred to a ruling by the United States Department of Education "that says that protocols can and should be provided, particularly to licensed professionals conducting follow-up assessments, because they are part of a student's educational records." *Id.* D.B. also requested that Ms. Benjamin send the notes of observations Ms. Benjamin took in administering the test. She did not provide them to D.B.

Next, Ms. Benjamin was questioned about the IEP's stated goal of "maintaining" J.B.'s skills as opposed to improving them. Ms. Benjamin wrote the word "maintain" on the IEP. She testified that "[w]e had collaborated together and decided as a team that that would be an appropriate way to word that." *Id.* at 505.

J.B.'s counsel also cross-examined Ms. Benjamin on the lack of specificity regarding the location, type, and amount of services that J.B. was to receive and the lack of benchmarks and measurable criteria in the IEP. Ms. Benjamin responded that the lack of specificity was intentional, and the IEP needed to be flexible to meet D.B.'s stated goal of enabling J.B. to attend as much regular education instruction as possible. She also admitted that the IEP Team could have been more specific and could have reconvened to revise the IEP if necessary.

Concerning the issue of full-time parapro support, Ms. Benjamin stated that her opinion after the second IEP meeting was that J.B. may not need a parapro all the time. "I had discussed that ... she may not need assistance. That was my opinion." *Id.* at 528. But later she testified that, by the end of the second meeting, the School District agreed to provide J.B. with full-time parapro support:

**Q.** So at this point in time, at least as you dealt with this meeting, it had not yet been agreed or offered by the County that [J.B.] would, in fact, get assistance at all times; isn't that correct?

**A.** No, I do not agree with that.

**Q.** So it had already been agreed but you were telling the family that when and if she needs assistance, it would be provided, even though it had already been agreed she needed assistance all the time?

**A. Yes.**

*Id.* at 530.

Finally, Ms. Benjamin's cross-examination ended with questioning about the potential harm to J.B.—physical, mental, and emotional—that could have resulted from an incomplete or inappropriate IEP. Ms. Benjamin agreed that such an IEP could cause a child to "get frustrated" and "shut down." *Id.* at 536.

### 4. Ms. Patricia Stuart

Ms. Stuart testified that she was a fourth grade teacher at Suwanee Elementary School. She earned her undergraduate degree from Mercer University and a masters degree in early education from Piedmont College. She attended only the third IEP meeting on May 17, 2002.

#### a. Direct Examination

Ms. Stuart testified that it was her understanding that J.B. "would have an adult with her full time in addition to the regular ed teacher there." Tr. Nov. 7, 2002, p. 579. She further testified that the IEP meeting involved a lot of dialogue with D.B.; that after reviewing J.B.'s IEP, there was nothing with which Ms. Stuart was not familiar; and that J.B. would be able to access the school environment in her wheelchair. She also explained the "pre-planning" process that would have occurred before J.B. arrived at Suwanee Elementary School. She explained, "Well, it's a team collaboration effort. I would meet with the experts, the other teacher, the adult working full time with [J.B.]. The [occupational therapist] and [physical therapist], we would have discussed plans prior

to [sic]. There would be a pre-planning." *Id.* at 583.

#### b. Cross-examination

Regarding the hours devoted to the orthopedically impaired program, Ms. Stuart testified that her interpretation of the IEP was that J.B. would receive a range of one to five hours of special education services. She further testified that there was a discussion at the third meeting about whether J.B. would have a full-time parapro. According to Ms. Stuart, J.B. had a full-time parapro "at all times . . . in addition to the regular ed teacher." *Id.* at 621–22.

Ms. Stuart was also cross-examined on the School District's decision to provide special transportation services for J.B. instead of regular transportation. J.B.'s counsel argued that special transportation picked students up from school twenty minutes prior to the end of the school day. This would be the equivalent of nine days over the 180–day school year. Ms. Stuart's response was that the last twenty minutes of the day was not "instructional time," *id.* at 637, and thus was not crucial to J.B.'s education.

### IV. ALJ's Findings of Fact

At the conclusion of the School District's case in chief on November 7, 2002, J.B. moved for an involuntary dismissal.[14] The ALJ immediately heard oral arguments from J.B. and the School District on this motion.

J.B. argued that the School District had not met its burden of proving that it offered J.B. a free appropriate public education. Regarding procedural violations, counsel for J.B. emphasized that GDOE

---

**14.** Pursuant to Georgia Administrative Rule of Procedure 616–1–2–.35, "[a]fter a party with the burden of proof has completed the presentation of its evidence, any other party . . . may move for dismissal on the ground that the party which has presented its evidence has failed to carry its burden so as to demonstrate its right to some or all of the determinations sought by that party."

Regulation 160-4-7-.04(1) requires the School District to meet *"all"* requirements of the IDEA and state law, and that, in the aggregate, the School District's procedural violations, which included, among other things, insufficient notice to the parents, rendered the IEP inadequate. This inadequate IEP could have harmed J.B. physically, mentally, and emotionally, and the School District gave no consideration to this potential harm. Counsel for J.B. also argued that the IEP was substantively deficient because it provided no objectives with measurable criteria and did not define a baseline from which to measure the objectives; the School District intentionally did not commit to providing services that were essential to formulating an adequate IEP so that it could have the discretion at a later date to discontinue those services; the School District wrongfully denied J.B. regular transportation, causing her to miss twenty minutes of each school day; the School District impermissibly used a range of one to five hours per week in defining J.B.'s orthopedically impaired program; J.B.'s physical therapy allotment was insufficient and the School District impermissibly expressed it in terms of a yearly range, rather than weekly or monthly; the School District had a stated and impermissible goal of "maintaining" J.B.'s skills rather than improving or restoring them; and the School District wrongfully denied J.B. extended school year services in the summer of 2002 and refused to discuss them at the IEP meetings.

The School District argued that it met its burden of proving it offered J.B. a free appropriate public education. Counsel for the School District stressed the fact that the School District reviewed J.B.'s private therapists' reports and D.B. agreed to most of the services, including occupational and physical therapy; the IEP shows that many of the issues J.B.'s counsel litigated, including the "significant" reduction in ser-

vices from the 2000 IEP, were deemed "resolved" at the conclusion of the IEP meetings; the School District did not use a range of one to five hours to define J.B.'s orthopedically impaired program; J.B.'s parents were notified about the attendees of the first IEP meeting and the second and third meetings were mere continuations and required no new notification; J.B. needed special transportation for safety reasons, and Dr. Garrett assured D.B. that J.B. would not have to miss the end of each school day; Dr. Garrett included thirty hours of regular education with support of the orthopedically impaired program to demonstrate the School District's commitment to full-time parapro support; the School District determined that J.B. did not need extended school year services but would continue to monitor this; and finally, the School District considered and discussed potential harm to J.B. and believed that the IEP was appropriate.

The ALJ explained that he was not prepared to rule on the motions from the bench. He directed the parties to submit proposed orders by the following Wednesday, November 13, 2002. The parties submitted proposed orders on November 13, and that same day the ALJ entered an order granting J.B.'s motion to dismiss with respect to liability. The ALJ adopted J.B.'s thirty-five-page proposed order almost verbatim. He concluded that the School District did not meet its burden of proving it provided J.B. a free appropriate public education. The ALJ stated:

> [T]here is not evidence from which the Tribunal may conclude that even as to the services [the School District] may have intended to offer this child, that they were actually presented to the Family as part of the required IEP. If the IEP intended to include these provisions, then the IEP presented to the Family and available to staff was incom-

plete and deficient. This adversely impacts the parental rights of decision-making, consent, and participation.

ALJ Interim Order, p. 8.

On November 19 and 25, 2002, the ALJ held a separate hearing on damages. The School District stipulated to the appropriateness of J.B.'s placement at the Friends School under the applicable *Carter/Burlington*[15] standard. The ALJ stated that the School District agreed to pay tuition for J.B.'s attendance at the Friends School for the 2002–03 school year, including the provision of an aide and mileage reimbursement for transportation to and from the Friends School.[16] ALJ Final Order, p. 15. The ALJ then stated that the burden shifted to J.B. to justify reimbursement for extended school year services in the summer of 2002 and related services during the 2002–03 school year, such as occupational therapy, physical therapy, and speech and language therapy.

After hearing testimony from J.B. and the School District, the ALJ concluded that J.B. was not entitled to reimbursement for occupational therapy, physical therapy, and speech and language therapy for the 2002–03 school year because they were not "related services" under the IDEA. The IDEA defines related services as those services "required to assist a child with a disability to benefit from special education." 34 C.F.R. 300.24(a). The ALJ held that J.B. presented no evidence that the related services for which she sought reimbursement were required in order for her to benefit from special education.

The ALJ also denied reimbursement for private services J.B. had received over the summer of 2002. Because these services occurred outside the school year, they were "extended school year services." Under Georgia regulations, a child qualifies for extended school year services when those "services are needed as part of the student's FAPE." Ga. Comp. R. & Regs. 160–4–7–.09(3)(i)(2). The ALJ determined that J.B. had not demonstrated eligibility for extended school year services; therefore she was not entitled to reimbursement.

Pursuant to 20 U.S.C. § 1415(i)(2), the School District filed this civil action in the United States District Court for the Northern District of Georgia seeking judgment vacating, in part, and replacing the ALJ's Final Order. J.B. counterclaimed, seeking a compensatory remedy, retroactive reimbursement, continued placement, and attorneys' fees under 20 U.S.C. § 1415(i)(3), because she prevailed in the administrative hearing.

The School District filed a motion for partial summary judgment as to the ALJ's determination that it denied J.B. a free

---

**15.** The *Carter/Burlington* standard references a pair of United States Supreme Court cases that established the standard for reimbursement when a school district does not provide a free appropriate public education. *See Burlington v. Dept. of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (holding that Congress intended to provide retroactive reimbursement for private school placement as a remedy for parents whose children were not offered a free appropriate public education by the State); *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (holding reimbursement was proper even though child's private school

did not the satisfy 20 U.S.C. § 1401(a)(18)'s definition of free appropriate public education but otherwise met the requirements of the IDEA).

**16.** The Court finds somewhat puzzling the ALJ's statement that the School District "agreed" to pay for J.B.'s tuition, personal aide and mileage. It is unclear whether the School District reserved the right to challenge the ALJ's determination after this agreement. If not, then it would seem that there is no point in this appeal.

appropriate public education; J.B. filed a motion for partial summary judgment affirming the ALJ's Interim Order. The Court addresses both motions in the discussion below.

## V. Standard of Review

■■■ "The usual [Federal Rule of Civil Procedure 56] summary judgment principles do not apply in an IDEA case." *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir.2003). Rather, a motion for summary judgment is "a procedural vehicle requiring [the district judge] to decide ... [the IDEA action] on the basis of the administrative record." *Id.* at 1313 n. 4 (internal citations omitted). The court reviews the record *de novo, JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1569, 1571 (11th Cir.1991), and must determine by a preponderance of the evidence whether to affirm the ALJ's opinion. 20 U.S.C. § 1415(i)(2)(C). In making this determination, the district court may act as factfinder but should consider administrative factfindings as prima facie correct, *Loren*, 349 F.3d at 1314 n. 5, unless the ALJ summarily decided the issue without making findings of fact. *See id.* at 1317 n. 6. While the court "must be careful not to substitute its judgment for that of the state educational authorities ..., the extent of the deference to be given to the administrative decision is left to the sound discretion of the district court which must consider the administrative findings but is free to accept or reject them." *Walker County Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297–98 (11th Cir.2000). If the District Court fails to adhere to the ALJ's factfindings, it should explain why. *Loren*,

349 F.3d at 1314 n. 5 (citing *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 531 (4th Cir.2002)).

## VI. J.B.'s and the School District's Motions for Partial Summary Judgment

■■■ After reviewing the administrative record below, including all transcripts and exhibits, and comparing it with the ALJ's Interim Order as to liability, this Court finds that there is insufficient evidence to support the ALJ's conclusion that the School District failed to meet its burden under *Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690. Although administrative findings are considered prima facie correct, the findings do not require deference where crucial evidence is missing. Because this Court cannot determine from the administrative record whether J.B. received an offer of a free appropriate public education, both parties' Motions for Partial Summary Judgment are denied for the reasons set forth below.

### A. *Rowley's* First Prong: Procedural Violations

■■■ Determining the existence of procedural violations completes only half of the first-prong inquiry under *Rowley* and its Eleventh Circuit progeny. The procedural violations must have also caused harm, either in the form of denying adequate educational benefits to the child or restricting the parents' rights to participate in developing the IEP. *Weiss*, 141 F.3d at 996; *Doe*, 915 F.2d at 653. The analysis used to determine harm in the form of denying adequate educational benefits essentially is the same as that used under the second prong of *Rowley*,[17] which

17. In *Collier County Sch. Bd. v. K.C.*, 285 F.3d 977 (11th Cir.2002), the Eleventh Circuit affirmed the district court's use of four factors (without formally adopting them as "the test") as guidance in determining whether

procedural violations of the IDEA amounted to a denial of a free appropriate public education. The district court borrowed those four factors from *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245 (5th

the Court will address later. Therefore, the Court addresses only the second type of harm—the parents' rights to participate in their child's education and give informed consent—in this Section.

The ALJ's Interim Order contains a list of undisputed procedural violations committed by the School District. For instance, there is no doubt that the notices for the second and third IEP meetings sent to J.B. and her mother did not strictly comply with the letter of the law, because the School District did not indicate who would attend as required by 34 C.F.R. 300.345. Rather, it provided general categories of possible attendees, and the School District admitted at trial that virtually any staff member would fall into one of these categories. The School District also offered a yearly range (as opposed to weekly or monthly) of physical therapy services it would provide to J.B. This is a direct violation of GDOE Regulation 160–4–7–.09(6)(a)(7), which specifically states that "[f]requency of service may not include yearly ranges." This Court adopts those findings of fact but, absent additional evidence, does not necessarily agree with the ALJ's conclusion that these procedural violations precluded parental participation and therefore denied J.B. a free appropriate public education.

The ALJ found that "[t]hese breaches, individually and collectively, unnecessarily and significantly interfered in the exercise of parental rights of participation and consent, and have resulted in the delay or interruption of [a free appropriate public education] to J.B." ALJ Interim Order, p. 22. Based on the undisputed facts and with no testimony from D.B., this Court finds that the procedural violations have not been shown to have precluded parental

participation. All the evidence in the record is to the contrary. D.B. was an active and vocal participant in every step of the IEP process, and the minutes and transcripts of the IEP meetings, along with the extensive correspondences between the School District and D.B., bear this out. *See Weiss*, 141 F.3d at 997 ("[T]he facts do not show that any of these procedural defects ... restricted the Weiss' ability to participate fully in Samuel's education."); *Doe*, 915 F.2d at 662 ("Because the notice deficiencies in this case had no impact on the Does' full and effective participation in the IEP process ... there has been no violation in this case which warrants relief.").

There are particular areas where material facts are still in dispute that could affect the issue of informed parental consent and therefore indicate a denial of a free appropriate public education. One such area involves whether the parties intended the addenda to be considered as part of the IEP. The ALJ found that they were only "staff minutes" and that D.B. did not know they were supposed to augment the IEP. There was no evidentiary support for the ALJ's conclusion that D.B. did not realize the addenda were part of the IEP. The ALJ reasoned that D.B. could not exercise informed consent because she had no way of knowing what comprised the IEP—essentially, there could not be a meeting of the minds. Again, the evidence is lacking on this point. The School District's witnesses testified that they intended these to be enforceable addenda. As for D.B., she was physically present at these IEP meetings, was an integral part of the discussions and decisions, was aware of the things to which the IEP Team agreed, and probably wit-

Cir.1997), which used the four factors to determine whether the second prong (the substantive prong) of *Rowley* had been met. This

signals that these two analyses are equivalent and can be collapsed into one discussion.

nessed the addenda being prepared. There was also testimony that D.B. brought written materials to the IEP meetings which were used to create both addenda. Furthermore, the concept of addenda was not foreign to D.B., because the 2000 IEP that she and the School District developed contained an addendum. In the transcript of the second IEP meeting in April, she specifically referenced "the addendum" and referred to some of the services that it listed. Pet'r Ex. 3, p. 71. Nevertheless the Court recognizes that it has not heard D.B.'s side of the story and is not prepared to make a final determination on this issue until a full evidentiary hearing can be had.

B. *Rowley's* Second Prong: Educational Benefits

■ To reiterate,· *Rowley's* second prong is an inquiry into whether "the individualized education program ... [was] reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. In *K.C.,* 285 F.3d 977, the Eleventh Circuit validated the district court's use of four factors as guidance[18] for determining whether an IEP provided "educational benefit." Those four factors are whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Id.* at 982 (quoting *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 253 (5th Cir.1997)). At the most basic level, the thrust of these factors goes to

whether the IEP provided "access" to the "basic floor of opportunity" originally discussed in *Rowley.* The analysis focuses on the actual contents of the IEP relative to the particular needs of the handicapped child, keeping in mind that "[g]reat deference must be paid to the educators who developed the IEP." *JSK,* 941 F.2d at 1573 (internal citations omitted).

1. Individualized on the Basis of the Student's Assessment and Performance

■ In November of 2001, the School District held a re-evaluation conference, which D.B. attended by phone because J.B. was sick. This conference determined how J.B. would be assessed in order to have data from which to develop an appropriate IEP. On December 3, 2001 D.B. provided School District staff with J.B.'s third grade curriculum at Christ Church Episcopal School; her student progress report; the academic and knowledge checklist for second grade; updates from J.B.'s occupational therapist, physical therapist, and speech and language pathologist; and classwork and copies of tests. On December 17, 2001, the School District administered the Wechsler Individual Achievement Test to measure J.B.'s cognitive skills and determine whether she was at a fourth grade level academically. In late January 2002, the School District received reports directly from J.B.'s physical and occupational therapists, and speech and language pathologist.

After collecting this information, three IEP meetings took place in March, April and May 2002. The resulting IEP was based on J.B.'s individual assessment and performance. From the data the school collected about her orthopedic impairment, she clearly required occupational therapy,

---

18. The Eleventh Circuit was careful to note that it was not formally adopting this as "the test," *K.C.,* 285 F.3d at 982 n. 6.

physical therapy, and speech and language therapy. Accordingly, her IEP provided for one hour of occupational therapy per week, one hour of speech and language therapy per week, and twenty hours of physical therapy per year. At the ALJ hearing, there was testimony that twenty hours per year of physical therapy was insufficient. In a thirty-six week school year, this amounts to approximately thirty-three minutes per week, which was within the range provided by J.B.'s private therapist (thirty minutes to one hour per week). Joint Ex. 267. Furthermore, assuming for the moment that the purported addenda were indeed addenda, the School District also committed to providing an array of assistive technology, supplemental aids and services, and modifications and accommodations to enable J.B. to access her educational environment.

One of the areas of concern this Court has with J.B.'s IEP is the uncertainty surrounding whether the School District would provide her with a full-time parapro. This goes directly to the first factor in *K.C.* D.B. consistently and vehemently insisted that J.B. absolutely needed a dedicated full-time parapro with her throughout the school day. Because some of J.B.'s needs are extremely personal in nature, D.B. stressed the need for the parapro to be the same person, not a rotation of different people. Moreover, D.B. explained that J.B. communicated better and was more comfortable around one dedicated parapro. Given the apparent severity of J.B.'s cerebral palsy, the Court agrees that J.B. needs a full-time parapro. The Court also feels comfortable that a rotation of two or three parapros is a sufficiently small group to protect and preserve J.B.'s dignity on sensitive issues like personal care and to become familiar enough with her speech patterns to effectively communicate with her.

The ALJ noted that the "IEP, minutes and documents do not address several material actions such as . . . the rejection of an individual aide," ALJ Interim Order, p. 23; but, the evidence does not support the ALJ's statement. The School District's lead witness, Dr. Garrett, testified that J.B. would have a parapro "for every moment [of the day]" and that "the disagreement [between the School District and D.B.] was about having the same person all day." Tr. Nov. 4, 2002, p. 268. Similarly, Ms. Stuart, who attended the last meeting on May 17, 2002, testified that "[t]he understanding was that [J.B.] would have an adult other than the regular ed teacher with her at all times." Tr. Nov. 7, 2002, p. 578. However, the transcripts from the second and third IEP meetings portray the School District as somewhat non-committal on the issue. Furthermore, despite D.B.'s repeated request to insert a specific provision for a dedicated full-time aide, the only mention of a full-time aide in the IEP is under the heading "Parent concerns:" "parent expects a dedicated paraprofessional." Joint Ex. 5. This Court is not prepared to decide whether J.B. was to receive full-time parapro support from a rotation of a few parapros under the IEP, and judgment on this issue is reserved until a further hearing.

2. Least Restrictive Environment

The Court is satisfied that J.B.'s education was scheduled to take place in the least restrictive environment. J.B.'s IEP provided that she would spend thirty out of thirty-two and a half hours per week in the regular education setting. That is approximately ninety-two percent of the week in regular education. Moreover, the School District agreed to pull her out of the regular education classroom for special education at strategic times so that she would not miss her regular academic instruction. The IEP Team specifically

committed to removing her from physical education class when the physical education teacher scheduled exercises and activities that would not be appropriate or feasible for J.B. While the School District required that J.B. use special education transportation, it did this out of a pragmatic concern for her safety in accessing the bus. Student safety is a legitimate concern, and requiring J.B. to use special transportation does not deny her access to the "basic floor of opportunity" envisioned in *Rowley*. Therefore, J.B.'s IEP placed her in the least restrictive environment.

## 3. Coordinated and Collaborated by the Key Stakeholders

J.B.'s services would have been "provided in a coordinated and collaborative manner by the key 'stakeholders.'" J.B.'s services were to be delivered by regular education teachers, in collaboration with orthopedically impaired specialists and their parapros, a physical therapist, an occupational therapist, and a speech and language pathologist. The IEP Team scheduled a meeting nine weeks after the beginning of school to assess this arrangement.

## 4. Positive Academic and Non-academic Benefits

The Court feels no need to address the fourth factor set forth in *K.C.*—whether positive academic and non-academic benefits are demonstrated. In *K.C.*, the district court declined to address this factor as well, because "of the extremely short period of time K.C. was in school." *K.C.*, 285 F.3d at 983. Similarly, it is impossible to assess whether J.B. demonstrated positive academic and non-academic benefits, because her mother rejected the IEP before the school year had even started.

There is insufficient evidence to determine whether the School District provided J.B. with a full-time aide in the IEP. Thus, this Court cannot determine whether the second prong of *Rowley* is satisfied. Furthermore, as previously discussed in Section VI.A, the Court needs additional evidence to determine whether the IEP process comported with *Rowley's* first prong. Therefore, both parties' Motions for Partial Summary Judgment must be DENIED.

## VII. J.B.'s Notice of Recent Supplemental Authority and the School District's Motion to File a Response Brief

The Court accepts J.B.'s Notice of Recent Supplemental Authority and GRANTS the School District's Motion for Relief to File a Response Brief. The Court has considered the parties' filings.

## VIII. J.B.'s Motion in the Alternative for Admission of Additional Evidence

As explained above, the Court denied J.B.'s Motion for Partial Summary Judgment and must now address J.B.'s Motion in the Alternative for Admission of Additional Evidence. Inasmuch as the Court has decided to hear additional evidence on issues outlined above, J.B.'s motion is GRANTED.

However, J.B.'s request to offer additional evidence in relation to the relief phase of the ALJ hearing requires a separate discussion. As previously mentioned, the ALJ denied J.B.'s claim for reimbursement for extended school year services in the summer of 2002, finding that she did not establish the services were needed as part of her free appropriate public education. The ALJ also denied her claim for physical therapy, occupational therapy, and speech and language therapy, finding that J.B. did not prove they qualified as "related services" under the IDEA. J.B.'s motion requests this Court to hear additional evidence on these rulings.

In *Bennett,* 203 F.3d 1293, the Eleventh Circuit set forth the standard for determining when to allow additional evidence. It adopted the holding in *Town of Burlington v. Dept. of Educ.,* 736 F.2d 773, 790–91 (1st Cir.1984), which explained that:

> [T]he Act contemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial. The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.
>
> . . . . .
>
> The determination of what is "additional evidence" must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo. A practical approach, we believe, is that an administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial.

*Bennett,* 203 F.3d at 1298 (citing *Burlington,* 736 F.2d at 790–91). The Eleventh Circuit adopted the following factors set forth in *Burlington* as a "nonexhaustive list" of considerations in ruling on a party's motion to admit additional evidence:

> [A] court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources.

*Bennett,* 203 F.3d at 1298.

According to J.B., neither she nor the School District presented direct therapist evidence at the ALJ remedy hearing regarding J.B.'s need for occupational therapy, physical therapy, speech therapy, and extended school year services. J.B. reasons that because the admission of such additional evidence would not be duplicative or cumulative, the factors set forth in *Bennett* and *Burlington* weigh in favor of admitting additional evidence on these issues. This Court disagrees.

In reviewing the administrative record, the Court finds no need to hear additional evidence regarding J.B.'s need for extended school year services or other related services. The administrative record contains ample evidence on J.B.'s needs, including reports from J.B.'s occupational, speech, and physical therapists, psychologist, and various other professionals since 1995. Moreover, counsel for J.B. presented the testimony of J.B.'s private parapro, physical therapist, and an Associate Professor of Special Education at Kennesaw State University at the ALJ remedy hearing. Given the volume of evidence on J.B.'s needs and the fact that J.B. had an adequate opportunity to submit evidence at the ALJ hearing, *Bennett* and *Burlington* counsel against granting J.B.'s motion to admit additional evidence. Thus, inasmuch as J.B.'s motion requests to augment the record developed at the ALJ remedy hearing, the motion is DENIED.

## IX. Conclusion

Because issues of material fact are still in dispute and the Court cannot resolve them based on the administrative record alone, the Court needs to hear additional evidence before determining whether J.B. received an offer of a free appropriate public education. Therefore, both parties' Motions for Partial Summary Judgment are hereby DENIED. The Court further orders the parties to produce the tape

recordings and full transcripts of the IEP meetings prior to the hearing.

This case will be placed on the Court's next available hearing calendar. An evidentiary hearing for the purpose of supplementing the record will be held on FRIDAY, November 18, 2005, at 10:00 a.m. The parties are directed to exchange witness and document lists at least twenty days before the hearing date.