**Jarron DRAPER, Plaintiff,**

v.

**ATLANTA INDEPENDENT SCHOOL SYSTEM, Defendant.**

**Civil Action No. 1:06–CV–487–MHS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 19, 2007.

David Moss Monde, Stephen C. Belan, Jones Day, Atlanta, GA, Steven Wyner, Marcy J.K. Tiffany, Wyner & Tiffany, Torrance, CA, for Plaintiff.

Audrey E. Moog, Maree F. Sneed, Hogan & Hartson, Washington, DC, Marcia E. Fishman, Atlanta Public Schools, Law Department, Atlanta, GA, for Defendant.

### ORDER

SHOOB, Senior District Judge.

There are several matters pending before the Court. The Court's rulings and conclusions are set forth below.

*Background*

This case arises under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiff Jarron Draper ("J.D.") is a twenty year old student, who at the time of the due process hearing in this case was enrolled in the 11th grade at Benjamin E. Mays High School within the Atlanta Independent School System ("APS"). On November 24, 2004, J.D. filed his due process hearing request before the Georgia Office of State Administrative Hearings, alleging that APS had denied him a free appropriate public education ("FAPE") under the IDEA. The matter was heard on three separate days in November 2005 before Administrative Law Judge ("ALJ") Steven D. Caley of the Office of State Administrative Hearings for the State of Georgia. The ALJ's Order, dated January 30, 2006, sets forth in detail the facts of this case. The Court will not restate all of those facts here, but provides the following facts which are relevant to the matters addressed by the Court below.

On February 24, 1998, when J.D. was in the 4th grade, his mother gave her consent for a complete comprehensive evaluation of him. APS administered the tests for its evaluation on June 1, 1998. Based on this evaluation, the school psychologist determined that J.D. had a full scale I.Q. of 63.

J.D. was promoted to 5th grade. On January 25, 1999, J.D.'s student support eligibility team met to assess the June evaluation results and services that J.D. might need. The team placed J.D. in the most restrictive educational environment available, a self-contained special education classroom for children with mild intellectual disabilities ("MID"). For the next two years, J.D. continued in the MID program at Usher Middle School.

By the 2002–03 school year, J.D. was in the 9th grade. From February 2003 until

July 2003, J.D.'s mother enrolled him at the Sylvan Learning Center ("SLC") at her own expense where his reading level increased from a 3rd grade level to a 5th grade level. Meanwhile, in early 2003, J.D.'s family insisted that APS evaluate him for the first time since 1998. On April 3, 2003, a school psychologist completed an evaluation of J.D. The school psychologist reported that J.D. was performing at the 2nd or 3rd grade level despite being in 9th grade. The test results showed that even though J.D. had a full scale I.Q. score of 60, significant variations of his test scores showed that the I.Q. score may not be an accurate reflection of J.D.'s true ability. Based upon discrepancies in the subtest scores, the school psychologist recommended that APS perform additional evaluations.

J.D.'s family objected to APS making any determinations regarding an appropriate education for J.D. based upon the April 2003 test results. However, APS continued to classify J.D. as MID on April 17, 2003. The family objected to APS's continued classification of J.D. as MID and insisted on additional testing.

In response, a different school psychologist performed an additional psychological evaluation on J.D. on July 23, 2003. The July 2003 evaluation confirmed that J.D. was not MID but had a specific learning disability. The tests showed that J.D. had a full scale I.Q. of 82, which was in the low average range of intelligence. The test examiner believed that this full scale I.Q. of 82 was a truer representation of J.D.'s overall level of cognition. The tests also showed that J.D. was at a 3rd grade reading level, 2nd grade spelling level, and 3rd grade arithmetic level. At the time of the testing, J.D. was in the 10th grade MID class at Mays High School.

On August 3, 2003, J.D.'s individualized education program ("IEP") team met to discuss the July 2003 test results. J.D.'s family requested private school and one-on-one tutoring in order to help J.D. close the achievement gap in his studies. No action was taken on these requests.

On September 9, 2003, J.D.'s IEP team recommended to provide him with 1.5 hours of speech tutoring. On October 7, 2003, J.D.'s IEP team amended his IEP to provide him with 19.5 hours in general education and 10.5 hours in special education in the 10th grade. J.D. was to attend regular classes for the first time since the 3rd grade and would receive after-school assistance for two hours per week.

In November 2003, a mediation was held which resulted in an agreement that APS would provide the Lexia reading program to J.D. to assist him with his deficits in reading by November 21, 2003. APS did not implement the Lexia program until December 9, 2003, and by January 12, 2004, J.D. had only received 2.5 hours of instruction with it.

In the meantime, J.D.'s family had filed a complaint with the Georgia State Department of Education. On January 27, 2004, a state hearing officer found that APS was not in compliance with state and federal requirements for providing J.D. with a FAPE. J.D.'s IEP team met on February 17, 2004, to review the findings by the hearing officer. Although J.D.'s family continued to express concern that he was below his grade level, school officials recommended that J.D. continue to use the Lexia reading program, tutoring, summer services, and keeping J.D. in 10th grade for the following year.

On May 24, 2004, J.D.'s family had him evaluated for the Lindamood–Bell reading program to determine whether his reading skills could be improved. Based on these test results, the Lindamood–Bell Center recommended J.D. receive intensive senso-

ry-cognitive training at a rate of 6 hours daily for 360 hours.

On May 26, 2004, J.D.'s IEP team met to review the Lexia reading program. Although test results showed that J.D. was still reading at an elementary level, the IEP team decided that J.D. would continue with the Lexia program and would audit Algebra for the summer. J.D.'s family requested reading services through either the SLC or the Lindamood–Bell program. APS told the family once again that they would have to file a formal complaint if they wanted to pursue the matter.

After continued requests from J.D.'s family, APS referred J.D. to Dr. Judy Wolman for an independent psychological evaluation. Dr. Wolman performed the evaluation on August 24 and 25, 2005, and the battery of tests showed that J.D.'s skills in several areas were severely discrepant from his potential. Dr. Wolman conducted extensive interviews with J.D.'s family as part of the comprehensive evaluation. Dr. Wolman concluded that J.D. suffered from a specific learning disability consistent with dyslexia. She also made recommendations about the types of services he needed in order to bring his skills closer to his potential so that he could perform independently as an adult.

On September 10, 2004, the Georgia Department of Education acknowledged that J.D.'s grades had not improved despite using the Lexia reading program. The Department informed the family that they could request a due process hearing if they were not happy with J.D.'s IEP or reading program.

On November 18, 2004, J.D.'s IEP team met again. Despite Dr. Wolman's test results and the family's repeated requests to use a different reading program, APS continued with the Lexia reading program.

By May 12, 2005, when J.D.'s IEP team met again, J.D. had failed his language arts class and was failing the second semester of algebra. By the time of the due process hearing conducted by the ALJ in November 2005, J.D. was 18 years old and in the 11th grade of high school.

The ALJ found that APS had failed to provide a FAPE to J.D. for the 2002–03, 2003–04, and 2004–05 school years.[1] The ALJ further found that since 1998 when J.D. was in the 3rd grade, APS had failed to provide J.D. with the key to his education by properly teaching him to read. The ALJ stated that APS had misdiagnosed J.D. by labeling him with the stigma of mental retardation as early as the 3rd grade and then APS made no effort whatsoever to further evaluate J.D. for five years, contrary to clearly established law. Although J.D. exhibited classic signs of dyslexia at a very early age, the ALJ found that APS was still incapable of making a proper diagnosis and it was only due to the continued insistence of J.D.'s family for more testing after March 2003 that led to a proper diagnosis of a learning disability in July 2003.

The ALJ further determined that J.D.'s family had no choice but to enroll him in an outside reading program at the SLC at their own expense at a total cost of $11,000. After five months at the SLC, J.D.'s reading level increased from grade 3 to grade 5. J.D.'s family could not continue to pay for this expense, and APS refused to pay for it. Instead, APS insisted on using a Lexia reading program, which the family agreed to but reserved their rights to proceed with a due process hearing request. Additional testing in 2004 after J.D. was placed in the Lexia reading program showed that he had regressed from a 5th grade reading level to a 3rd grade

---

1. The ALJ found that the two year statute of limitations applicable to an IDEA claim barred any claim in the case prior to the 2002 school year.

reading level and was having difficulty in many of his core subjects in high school.

The ALJ also found that J.D. had continually claimed a right to additional services from APS at every IEP team meeting that had been held since at least early 2003. J.D. was pursuing that claim actively at the time of the May 2005 IEP meeting. Therefore, the ALJ concluded that J.D. had not agreed to an IEP on May 12, 2005, but instead the family continued to insist on additional private remediation services in reading.

The ALJ concluded that APS had not provided J.D. a basic floor of opportunity as required by law, and that APS's insistence upon a reading program that had not resulted in even a minimal educational benefit to J.D. in almost a three year period with respect to his reading ability, did not satisfy the requirements of the IDEA. The ALJ found that J.D. was entitled to compensatory services and that an entity other than APS should provide those services if J.D. elected. The ALJ concluded that APS had forfeited its right to continue to "educate" J.D. by misdiagnosing him, refusing to re-evaluate him for five years, insisting on continuing with a course of instruction for almost three years despite no benefit to J.D., etc. The ALJ found that the appropriate remedy was for J.D. to choose from two options: Option 1 included remaining in the APS with the addition of various support services and Option 2 included placing J.D. outside the APS at a private school. In addition, the ALJ held that J.D. was entitled to reimbursement of $11,000 for the costs incurred at the SLC in 2003 and to all litigation costs including expert witness fees and attorney fees incurred in bringing the action.

Both J.D. and APS have challenged the ALJ's decision. *See* 20 U.S.C. § 1415(i)(2)(A) (any party aggrieved by the result of the administrative proceedings has the right to bring a civil action in the district court). The parties' appellate briefs are now before the Court.

*Standard of Review*

■ After an aggrieved party has brought a civil action in the district court, the Court will receive the records of the administrative proceedings, hear additional evidence at the request of a party, and grant relief as the Court determines is appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). When the Court reviews the ALJ's Order, the Court's decision is best described as a judgment on the record. *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir.2003). The usual summary judgment principles do not apply in an IDEA case, and the Court often conducts a bench trial on a stipulated record and makes a decision on the merits even if there exist disputed issues of material fact. *Id.*

■ The Court must determine by a preponderance of the evidence whether to affirm the ALJ's Order. *Id.; Gwinnett County Sch. Dist. v. J.B.*, 398 F.Supp.2d 1245, 1268 (N.D.Ga.2005). The ALJ's decision is entitled to due weight, and the Court should not substitute its own "notions of sound education policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Walker County Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297–98 (11th Cir.2000). However, the Court has the discretion to determine the level of deference it will give to the ALJ's findings. *Sch. Bd. of Collier County, Fla. v. K.C.*, 285 F.3d 977, 983 (11th Cir.2002); *Walker County Sch. Dist.*, 203 F.3d at 1297–98. The Court must consider the administrative findings of fact, but is free to accept or reject them. *Walker County Sch. Dist.*, 203 F.3d at 1297–98. Stated simply, the role of the Court is to

"review the administrative determinations contemplated by the Act." *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853, 857 (11th Cir.1988) (quotations omitted).

## Discussion

The purpose of the IDEA is to (1) ensure that all children with disabilities have a FAPE that emphasizes special education services designed to meet their unique needs and prepare them for further education, employment, and independent living; (2) protect the rights of disabled children and the parents of those children; and (3) assist states and other agencies with providing education for disabled children. 20 U.S.C. § 1400(d)(1). The IDEA guarantees disabled students a FAPE. *Loren F.,* 349 F.3d at 1311. A FAPE is defined as special education and related services that "(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d)." 20 U.S.C. § 1401(9). To provide a FAPE, a school formulates an IEP during a meeting between the student's parents and school officials. 20 U.S.C. §§ 1414(d)(1)(A)-(B). An IEP is a written statement for each disabled child that includes a statement of the child's present levels of academic achievement and functional performance, a statement of measurable annual goals, a description of how the child's progress toward meeting annual goals will be measured, a statement of the special education and related services to be provided to the child, and a statement of the program modifications or supports for school personnel that will be provided for the child. 20 U.S.C. § 1414(d)(1)(A). The IEP team consisting of the parents of the child, school officials, and if appropriate, the disabled child, reviews the child's IEP at least annually to determine whether the annual goals for the child are being met, and the IEP team revises the IEP as appropriate. 20 U.S.C. § 1414(d)(4).

The parents or the local education agency may file a due process hearing request if either disagrees with the IEP or believes that the child has been denied procedural or substantive rights to a FAPE. 20 U.S.C. § 1415(f). In Georgia, such hearings are conducted by the Office of State Administrative Hearings. O.C.G.A. § 50-13-41(a)(1).

J.D. alleges that he is aggrieved by the ALJ's Order and submits two grounds for appeal to this Court. First, J.D. argues that the ALJ erred by holding that J.D.'s claims for violations of the IDEA that occurred before November of 2002 are barred by the two-year statute of limitations. Second, J.D. argues that the ALJ erred by providing inadequate compensatory services for APS's denial of a FAPE to J.D.

APS also claims that it is aggrieved by the ALJ's Order. It argues that it fulfilled its obligations to provide J.D. a FAPE, the ALJ erred in finding that APS violated the IDEA, and the Court should deny plaintiff's requests for relief. More specifically, APS contends that the ALJ (1) violated the two-year statute of limitations; (2) made findings of fact with no evidentiary support; (3) failed to apply the proper standard for a FAPE; and (4) created a remedy unauthorized by the law or the evidence.

### A. Statute of Limitations

The ALJ found that the two-year statute of limitations applicable to an IDEA claim barred any claim in the case prior to the 2002 school year. Both J.D. and APS agree that the relevant statute of limita-

tions applicable to IDEA claims is two years. The parties dispute when J.D.'s IDEA claims accrued.

J.D. argues that his claims under the IDEA accrued in April 2003, when APS finally reassessed J.D. at the family's urging and the family received the test results and learned that he was not MID. In April 2003, J.D. contends that the family learned that APS had injured him in the following ways: (1) failed to properly assess him in the 1995–1996 school year; (2) improperly placed him in the MID class; (3) failed to reassess him for five years (from 1998 until 2003), resulting in a continuous improper placement in the MID class; and (4) failed to provide him with appropriate remediation once his family discovered the error. Therefore, J.D. contends that his award of compensatory services should be based on the denial of FAPE since 1995–96.

APS argues that the ALJ improperly considered events beginning in 1995, and that the ALJ was barred by the two-year statute of limitations from looking at any evidence prior to November 24, 2002. APS argues that the ALJ erred in relying on the 1998 evaluation and this tainted his view of the entire case. APS further contends that in January 2002, J.D.'s middle school asked for and received J.D.'s parent's consent to conduct a new eligibility assessment. Therefore, his parents knew or should have known of any claim related to or arising from the failure to perform the reassessment when no assessment followed the request for consent in early 2002. APS admits that it failed to reevaluate J.D.'s eligibility on a timely basis within three years of his prior eligibility assessment in January 1999. Yet, APS contends that these claims are barred by the two-year statute of limitations because they occurred before November 24, 2002.

■ The limitation for an IDEA claim is two years. *Mandy S. v. Fulton County Sch. Dist.*, 205 F.Supp.2d 1358, 1366 (N.D.Ga.2000). Under federal law, the IDEA claims accrue "when the parents know or have reason to know of the injury or event that is the basis for their claim." *R.R. v. Fairfax County Sch. Bd.*, 338 F.3d 325, 332 (4th Cir.2003); *Dreher v. Amphitheater Unified Sch. Dist.*, 22 F.3d 228, 232 (9th Cir.1994); *Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 408 (6th Cir.1991) (quotations omitted). The parents must be in possession of "critical facts" which indicate that the child has been hurt and the defendants are responsible for this injury. *K.P. v. Juzwic*, 891 F.Supp. 703, 716 (D.Conn.1995) (quotations omitted). The injury that allows a parent to request a due process hearing in an IDEA case is a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child or the provision of a FAPE. 20 U.S.C. § 1415(b)(6).

■ J.D. contends that his family learned in 2003 that APS had injured him by failing to assess him during the 1995–1996 school year. J.D.'s school records indicate that he was held back in either the 2nd or 3rd grade and that his mother was aware of the difficulty he was having and his need for help in February 1995, September 1996, and February 1997. Therefore, she had reason to know that there was a problem but that APS had not assessed him during this time. J.D.'s claim from 1995–96 is barred by the two-year statute of limitations because his mother had two years from 1995–1997 to bring her claim but failed to do so until November of 2004. *See James v. Upper Arlington City Sch. Dist.*, 987 F.Supp. 1017, 1023–24 (S.D.Ohio 1997), *aff'd*, 228 F.3d 764 (6th Cir.2000) (IDEA claim barred by the statute of limitations because parents knew that their child had suffered an injury from the school, but waited several years to file a due process request). Finally, the

ALJ notes that he has set forth historical facts prior to November 2002 as background material and to provide context for the claims, not to support a violation of the IDEA.

Next J.D. argues that APS improperly placed him in the MID class. APS placed J.D. in the self-contained MID class in January 1999. J.D.'s family did not have the critical facts to know that J.D. had been injured by this placement until they received the results of the testing in 2003 that confirmed that J.D. was not MID. Although J.D.'s mother consented to his MID placement and participated in his IEPs until 2003, she could not have had the critical facts that he was not MID until tests confirmed this in 2003. Therefore, J.D.'s claim for improper placement in the MID class is not barred by the two-year statute of limitations because his family had reason to know only in 2003 that he had been injured by this placement. J.D. filed his due process request within two years from 2003 when his parents learned of the injury, and therefore J.D.'s claim that APS improperly placed him in the MID class is not barred by the statute of limitations. *See K.P.*, 891 F.Supp. at 716–17 (IDEA claim for inappropriate education spanning several years accrued only after the plaintiff was placed with another education program and his gains indicated that he had the capacity to attain academic goals).

Next, J.D. contends that APS injured him by failing to reassess him for five years—from 1998 until 2003. However, according to the record, in January 2002, J.D.'s middle school asked for and received his mother's consent to conduct a new eligibility assessment. J.D.'s mother attended an IEP meeting in April 2002, and APS still had not assessed J.D. at this time. APS did not conduct this assessment until the family demanded it over a year later in April 2003. Therefore, J.D.'s

family had reason to know that APS had injured J.D. by the spring of 2002 when APS still had not completed the assessment. Yet, J.D. did not file his due process request until November 2004, making any claim that accrued before November 2002 barred by the two-year statute of limitations. However, as of November 2002, APS still had not reassessed J.D. Therefore, APS's failure to reassess J.D. from November 2002 until testing in April 2003 is within the statute of limitations.

Finally J.D. argues that APS failed to provide him with appropriate remediation once his family discovered the error in 2003. These claims are clearly within the two-year statute of limitations.

### B. Burden of Proof

APS argues that the ALJ erred by placing the burden of proof on it, and that instead, J.D. bore the burden of proof at the administrative level. J.D. argues that the ALJ did not err by placing the burden of proof on APS and correctly found that even if the burden of proof was on J.D. then he had met his burden. The Court concludes that the ALJ did not err because although he found that APS bore the burden of proof, he alternatively held that even if J.D. bore the burden of proof, as APS now contends, then J.D. met his burden.

### C. ALJ's Findings of Fact

APS argues that the ALJ made findings of fact with no evidentiary support and improperly admitted witness testimony via telephone. APS contends that many of the ALJ's findings were created by him, he made improper citations to evidence, and he made egregious mischaracterizations of testimony.

First, APS argues that the ALJ erred by admitting testimony from Drs. Dragan and Wolman via telephone because APS

did not consent to this telephone testimony. The ALJ states in his Order that he permitted Drs. Dragan and Wolman's testimony via telephone because the witnesses were beyond subpoena power, the witnesses could not travel to the hearing in person in time, and APS would not be prejudiced by not having them there in person.

The Court finds that the ALJ did not err in allowing Drs. Dragan and Wolman to testify via telephone during the hearing. Although hearings may be conducted by the ALJ via telephone if all parties consent, the ALJ conducted the hearing in person over three days. *See* Ga. Comp. R. & Regs. 616–1–2–.22(4) In addition, the ALJ retained the discretion to establish the methods and procedures to be used to develop evidence. *See* Ga. Comp. R. & Regs. 616–1–2–.22(1)(b). The ALJ did not want to delay the re-scheduled hearing any further, and APS was not prejudiced because it had an opportunity to cross-examine these witnesses. In order to conduct a fair and expeditious hearing, the ALJ was correct to admit this testimony. *See* Ga. Comp. R. & Regs. 616–1–2–.22(1)(*o*).

 Second, APS argues that the 1998 MID designation was proper. APS contends that the conclusion that J.D. was misdiagnosed appears nowhere in the record and there is no other evidence from which the ALJ could have reached this conclusion. APS claims that because the ALJ relied on his unfounded conviction that J.D. was misdiagnosed in making every significant factual and legal finding, his decision is entitled to no deference.

The Court has reviewed the record in this case, including reading the entire transcript from the three-day hearing conducted by the ALJ. The Court finds that the ALJ's factual findings are accurate and reasonable. The ALJ makes several references to the 1998 misdiagnosis of J.D. as MID but notes repeatedly that J.D.'s edu-

cation prior to November 2002 is provided as background material and that claims related to this period are barred by the statute of limitations.

Moreover, the ALJ's conclusion about J.D.'s misdiagnosis is supported by evidence. APS points out that Dr. Johnson, director of program for exceptional children for APS, testified that a certified psychologist conducted the evaluation of J.D. in 1998 and had not misdiagnosed J.D. as MID because his scores were in the MID range. On the other hand, Dr. Dragan, an expert in learning disabilities, reading disabilities, and special education, testified that APS did not inquire sufficiently into J.D.'s learning problem in conducting its evaluation in 1998, the diagnosis and classification of MID were inaccurate, and that he was classified as MID instead of exploring the issue of a learning disability. Dr. Dragan continued that the school did not conduct a comprehensive evaluation and that it was extremely important to get information from J.D.'s family about his functional behavior outside of school in order to make a proper assessment.

The facts show that the 1998 evaluation did not include any behavioral information from J.D.'s family, measure his processing speeds to determine whether his problems were a result of an inappropriate diagnosis created by the existence of a specific learning disorder, or measure his phonological processing levels, which are essential to reading. Furthermore, J.D. had been seen writing letters, numbers, and words backward, consistent with the learning disability of dyslexia. Finally, an evaluation in July 2003 showed that J.D. was not MID but suffered from a learning disability. Based on a preponderance of the evidence, the Court concludes that the ALJ's findings about the 1998 evaluation and

J.D.'s misdiagnosis as MID are accurate and entitled to deference.

▇ In addition, the ALJ was able to assess the credibility of witnesses before him, including the speech and demeanor of J.D., the unprofessional attitude of APS officials,[2] and the unreliable testimony of Dr. Bogan. With witnesses and evidence before him, the ALJ made the determination as to how much weight to give each witness, including Dr. Thomas and his testimony about the misdiagnosis of J.D. In particular, the ALJ found that based on J.D.'s demeanor and articulate speech, it was "incredulous that anyone, let alone supposedly trained professionals, could have deemed [J.D.] mentally retarded as late as 2003." ALJ Order at 23. Having not had the benefit of witnesses before it, the Court will not second-guess the ALJ's findings with regard to these witnesses. *See Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir. 2000) (administrative findings are based on the agency's presumed educational expertise and a fair estimate of the worth of the testimony before it).

D. Whether APS Provided J.D. with a FAPE

APS argues that the ALJ erred by finding that APS had denied J.D. a FAPE for the 2002–03, 2003–04, and 2004–05 school years. The ALJ found that APS had failed abjectly to provide J.D. with the key to his education by properly teaching him to read. The ALJ found that APS's insistence upon a reading program (the Lexia program) that had not resulted in even a minimal educational benefit to J.D. in almost three years with respect to his reading ability did not satisfy the requirements of the IDEA. The ALJ concluded that APS had certainly not provided a basic floor of opportunity for J.D. and had not even provided a trivial benefit, let alone an adequate benefit. The ALJ noted that despite the fact that J.D. was still failing classes and his reading level had remained virtually unchanged, APS refused to make any adjustments, and therefore, APS had not provided J.D. with a basic floor of opportunity.

APS argues that the ALJ erred in finding that APS had not provided J.D. with a FAPE for the 2002–05 school years. APS argues that the ALJ (1) failed to conduct the proper analysis to determine whether APS had provided J.D. with a FAPE, (2) used the wrong standard, (3) based his findings on the mistaken belief that J.D. had been misdiagnosed in 1998, and (4) made no effort to evaluate the individual IEPs, the services APS offered to J.D., or the educational benefit that the IEPs were calculated to provide J.D.

APS contends that J.D.'s IEPs from the 2002–05 school years were developed according to IDEA's procedural requirements. APS argues that J.D.'s IEPs were developed with his own participation and that of his family, were based upon the

---

2. The ALJ noted the following:

The written transcript of the hearing in this case cannot possibly capture the air of disdain and tone of contempt that the APS officials showed toward J.D.'s efforts to acquire a program of reading instruction that will give him a fighting chance to read. For example, Faustina Haynes ... physically turned to the side on the witness stand and refused to look at Ms. Morgan [J.D.'s aunt who represented him at the hearing], during most of Ms. Morgan's cross-examination. Similarly, Dr. Johnson ... spent much of the time during the hearing leaning completely back in her chair with her eyes closed whenever a witness was testifying on J.D.'s behalf. The overt behavior by APS officials went beyond the bounds of normal adversarial behavior.... J.D.'s testimony regarding the school system's treatment of him was highly credible.... A lesser spirit would have been crushed long ago. ALJ Order at 31 n. 6.

consideration of accurate, up-to-date information from assessments and teachers, and included individualized services based upon his unique needs. APS contends further that the IEPs substantively were reasonably calculated to allow J.D. to receive educational benefits. APS claims that in order to provide J.D. with the basic floor of opportunity, APS did not need to get J.D. "caught up" but rather was required to increase J.D.'s skills year by year. APS avers that its implementation of the IEP using the Lexia program supported J.D.'s goals and objectives and allowed him to achieve some educational benefit, as demonstrated by his progress in the program. APS argues that it reasonably calculated that the Lexia program, the provision of one-on-one tutoring services, and other special education services would provide J.D. with educational benefits and help him improve his reading level. APS asserts that J.D. failed to show up for tutoring sessions and to complete assignments. APS contends that the fact that J.D.'s test scores continued to demonstrate a discrepancy between achievement and ability confirm that he had a learning disability, but do not demonstrate a lack of academic progress in school. Finally, APS argues that J.D. has obtained substantial educational benefits and more than a trifle throughout the years, as demonstrated by his being able to obtain high school credits in certain regular education courses.

J.D. argues in response that the ALJ used the correct standard and correctly found that APS denied J.D. a FAPE for 2002–05 school years. J.D. contends that the ALJ was correct that APS's placement of J.D. in the MID program in the 2002–03 school year based on the 1998 evaluation was inappropriate. J.D. further avers that there is no dispute that APS violated the

IDEA by failing to reassess J.D. for five years. J.D. argues that the time period from November 2002 until the appropriate evaluation in July 2003[3] falls within the statute of limitations, and that APS should be held accountable. J.D. claims that his promotion from grade to grade while in the MID program is not significant because he was found to be of normal intelligence, and that once he was placed in regular education courses, he began to fail his classes. J.D. argues that the gap between him and his peers substantially widened because his reading level actually regressed between 2004 and 2005, and then remained at a 3rd grade level through the date of the hearing. J.D. contends that the ALJ's conclusion that J.D. received no educational benefit from the Lexia reading program is well supported by his thorough and careful findings of fact.

Although APS's failure to provide J.D. with a FAPE in reading is sufficient to violate the IDEA, J.D. asserts further that APS placed J.D. in a college preparatory program and regular education courses with virtually no supports after he had spent years in the MID program, thereby setting J.D. up for failure. J.D. contends that the evidence shows that he needed to read at the 5th or 6th grade level to survive in high school but that J.D. was at the 3rd grade reading level. Finally, J.D. argues that APS provided none of the services and supports in any of J.D.'s IEPs that were recommended at the hearing by Drs. Wolman, Dragan, and Bogen.

 The Court's inquiry as to whether APS has provided J.D. with a FAPE consists of two questions: (1) Has the State complied with the procedures set forth in the Act? and (2) Is the IEP devel-

---

3. J.D. contends that APS's April 2003 evaluation was deficient because no adaptive behavioral evaluations were completed by the family and only one source was used for an adaptive behavioral evaluation.

oped through the Act's procedures reasonably calculated to enable the child to receive educational benefits? *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. The U.S. Supreme Court has held that a State provides a FAPE when it provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. *Id.* at 203, 102 S.Ct. 3034. The IDEA does not require that the school maximize a student's potential, only that it provide a "basic floor of opportunity." *Id.* at 201, 102 S.Ct. 3034; *JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1573 (11th Cir.1991). However, public schools do not satisfy the IDEA by offering mere token gestures or a trifle of benefits. *See JSK*, 941 F.2d at 1573; *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir.1989). "The FAPE described in an IEP need not be the best possible one ... rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Loren F.*, 349 F.3d at 1312 n. 1 (quotation and citations omitted).

▮▮▮▮ The Court's analysis focuses on the actual contents of the IEP relative to the particular needs of the child. *JSK*, 941 F.2d at 1573. In evaluating the appropriateness of an IEP, the Court must determine the measure and adequacy of an IEP at the time it was offered to the student and not at some later date. *Carlisle Area School v. Scott P.*, 62 F.3d 520, 535 (3rd Cir.1995). An IEP must be "likely to produce progress, not regression or trivial educational advancement." *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir.1997) (internal citation omitted). Finally, the Eleventh Circuit has defined appropriate education as making measurable and adequate gains in the classroom. *JSK*, 941 F.2d at 1573.

▮▮ First, the Court has reviewed the standard employed by the ALJ to determine whether APS provided J.D. with a FAPE and concludes that the ALJ used the correct standard pursuant to *Rowley*. Second, after a thorough review of the evidence, the Court concludes that the ALJ's conclusion that APS did not provide J.D. with a FAPE for the 2002–03, 2003–04, and 2004–05 school years is correct, as explained more fully below. The ALJ's findings are based on his presumed educational expertise and a fair estimate of the worth of the testimony before him, and they were thoroughly and carefully made. Therefore, the Court will not set aside his administrative findings in this matter. *See Cory D. ex rel. Diane D. v. Burke County Sch. Dist.*, 285 F.3d 1294, 1298 (11th Cir. 2002); *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir.2000). The Court gives due weight to the ALJ who is far better versed in educational policy and practice than the Court, and therefore better suited to the difficult task of evaluating J.D.'s progress under the IEPs. *See J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F.Supp.2d 386, 398 (S.D.N.Y.2004).

As for the 2002–03 school year, J.D.'s IEPs were not based on accurate, up-to-date information as APS contends because they were based on the 1998 evaluation. APS has admitted that it failed to timely reassess J.D. from 1998–2003, and therefore APS did not have up-to-date information to design J.D.'s IEP in the fall of 2002. As previously noted, APS's failure to reassess J.D. from November 2002 until testing in April 2003 falls within the statute of limitations. The 1998 evaluation was not accurate because it was not comprehensive or tested for a specific learning disorder, and later more comprehensive evaluations showed that J.D. was not MID as the 1998 evaluation had concluded.

APS argues that the IEPs were adequate based on the information APS had at the time. An "IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, the time that the IEP was promulgated." *Mandy,* 205 F.Supp.2d at 1367. At the time J.D.'s IEP was promulgated for his 2002–03 school year, it was objectively reasonable for APS to base that IEP on a timely and accurate assessment of J.D. APS failed to do this. J.D.'s IEPs were not adequate for the 2002–03 school year because they were based on inaccurate and outdated information. Due to this inaccurate and outdated information, APS was unaware of J.D.'s unique needs. Therefore, APS did not provide an IEP that was specifically designed to meet his individualized needs for the 2002–03 school year.

Regarding J.D.'s reading skills, after a thorough review of the record, the Court agrees with the ALJ that APS failed to provide J.D. with a FAPE by not providing him with a basic floor of opportunity in reading. Despite the fact that his reading skills decreased, APS continued to use the Lexia reading program, and by the time of the hearing he was still reading at the 3rd grade level.

Ms. Haynes, an APS witness who had eleven years of special education experience, testified that J.D. needed to be able to read at the 5th or 6th grade level in order to survive in high school. At the time J.D. entered the 2003–04 school year and was to be placed in regular education high school courses, APS knew that he was not reading at the 5th or 6th grade level as confirmed by both the April 2003 and July 2003 evaluations.[4] APS did not even begin

to provide reading assistance to J.D. in the Lexia program until December 2003 and by January 2004 he had only received 2.5 hours of Lexia services. J.D. testified that the Lexia program was not helpful for his work in the regular education courses.

Test results from the spring of 2004 showed that J.D. was still reading at an elementary level. J.D.'s Lexia instructor informed the IEP team that J.D.'s reading skills were inconsistent in the Lexia program and his Lexia tutor informed them that he was still in the 3rd grade reading level. Despite this, the IEP team concluded that he would continue with the Lexia program over the summer.

In September 2004, the Georgia Department of Education acknowledged that J.D.'s grades had not improved despite using the Lexia program. The IEP team met again in November 2004. The IEP team continued to recommend using the Lexia program despite knowing since the spring of 2004 that J.D. was not receiving an adequate educational benefit in reading from the program.

At the hearing, Dr. Johnson acknowledged that J.D.'s reading level was at a 3rd grade level in 2003 and 2004, which showed no progress in reading. Ms. Haynes confirmed that despite J.D.'s use of Lexia for 18 months, by May 2005 he had failed his language arts class. Ms. Fletcher, a licensed speech pathologist with over 18 years of experience, conducted an evaluation of J.D. in May 2004 and then again in September 2005 to determine his current levels of function. She testified that his reading and language scores decreased and that there had been no ap-

---

**4.** The tests in April 2003 showed that his reading comprehension was at the end of the 4th grade level, his reading decoding was at the 3rd grade level, and his scores were consistent with his teacher's reports of his academic functioning between the 2nd and 3rd

grade level. The test results from July 2003 showed that he was at a 3rd grade level in reading, a 2nd grade level in spelling, and that he had deficits in reading comprehension.

parent growth while he was in the Lexia program. She further concluded that the Lexia program required skills that J.D. did not have in order to use it.

Based on a preponderance of the evidence, the Court agrees with the ALJ's conclusion that APS failed to provide J.D. a FAPE by providing him essentially the same services that had failed him for three years in reading. The Court agrees with the ALJ that APS's insistence on using the Lexia program for three years with respect to his reading ability does not comport with the requirements of the IDEA.

There is further evidence from the record that APS failed to provide J.D. with a FAPE in areas other than reading. APS argues that the ALJ failed to compare the components of J.D.'s IEPs for the different school years to determine whether APS provided J.D. with a FAPE. A comparison of J.D.'s IEP for the 2003–04 school year with his IEP for the 2004–05 school year shows that his IEPs were not designed to meet his individualized needs and not reasonably calculated to enable J.D. to receive more than a trifle of educational benefits.

For example, at the September 2003 IEP meeting, J.D.'s math teacher stated that he was misplaced and should be placed in a remedial class. J.D.'s 2003–04 IEP (amended in October 2003) states that J.D. was having trouble in math reasoning and math calculation. The IEP includes a specific instructional objective sheet to address J.D.'s weaknesses in math. It lists the areas he should master, a review date of April 2004, and a stated objective of developing or improving his basic academic skills to the 5th grade level. See # DRAPER–APS—00093.[5] Also included with this IEP are assistive technology recommendations including a web-based math program to assist J.D. in meeting his goals. The IEP team specifically recommended that J.D. receive 1.5 hours of speech weekly and his goals were to focus on language development. There is no mention of any other math assistance or focus on math goals except for the web based program in the assistive technology recommendations.

As of October 2003, J.D. was no longer in a regular education math class, and the IEP team reviewed his math skills. He received direct services in math by February 2004. At the time of the IEP meeting in April 2004, J.D. was still in the remedial math class and his teacher noted that he needed assistance in math. The IEP notes further state that APS will continue to provide him remedial services in reading for the summer but there is no mention of any assistance with his math skills.

Although J.D.'s 2003–04 IEP instructional objective sheet for math provides for a review date of April 2004, there is no comment or review on whether J.D. had mastered these objectives for the school year. In addition, J.D.'s 2004–05 IEP instructional objective sheet for math, dated April 2004, provides no comment or review on whether J.D. had mastered these objectives for either the 2003–04 or 2004–05 school years. The review sections from each year are blank.

Ms. Haynes testified that at the April 2004 IEP meeting, she reviewed J.D.'s previous school year's goals and objectives but does not state what was discussed at the meeting or whether the team determined that he had mastered his 2003–04 objectives. Ms. Haynes also testified that the IEP team met on May 12, 2005, and discussed J.D.'s goals and objectives and whether he had mastered them. Although the IEP team might have discussed his goals and objectives, there is no evidence that he actually met the stated goals and

5. This number refers to the bates-stamp numbers of the Administrative Record.

objectives. The fact that the comments and review sections of both instructional objective sheets are blank indicate that no attention had been paid to determine if J.D. was meeting his objectives. *See Helms v. Indep. Sch. Dist. No. 3 of Broken Arrow, Tulsa County, Okl.,* 750 F.2d 820, 825 (10th Cir.1985) (the columns listing the student's progress were blank on the student's IEP instructional objectives sheet indicating that no attention whatsoever had been paid to the extent to which the student was accomplishing her objectives, in violation of IDEA). The Court finds it unacceptable that APS failed to document J.D.'s progress for these years in math. Without this knowledge, APS would be unable to design an IEP for J.D. for the upcoming year that was tailored to his needs.

Moreover, the 2003–04 IEP instructional objective sheet states that it is to develop or improve J.D.'s basic skills to the 5th grade level. However, during the 2003–04 school year, J.D. was enrolled in high school regular education courses. He received assistance with his courses in his study skills class. Despite the fact that there is no evidence that APS determined J.D. had improved his basic academic skills to the 5th grade level, J.D. remained in regular education courses for the following year. Also as previously noted, in April 2004, J.D. was still in the remedial math class and his teacher noted that he needed assistance in math. Despite this, in April 2004 the IEP team recommended that he audit algebra for the summer and take algebra the following year. Because APS had not evaluated his math skills and IEP objectives to determine whether he had reached the 5th grade level, APS could not have designed his IEP to meet his needs.[6]

Furthermore, APS used the exact same instructional objective sheet for math in his 2003–04 IEP as in his 2004–05 IEP. See # DRAPER–APS—00205. APS recommended that J.D. repeat 10th grade for the 2004–05 school year, which would indicate that he had not met his objectives. If he had not met his objectives, then APS was required to amend his IEP. 20 U.S.C. § 1414(d)(4) (an IEP must be amended if its objectives are not met); *Loren F.,* 349 F.3d at 1312. If he had met his objectives, merely copying J.D.'s IEP from one year to the next regardless of his progress is also unacceptable. *See Carlisle,* 62 F.3d at 534 (merely copying an IEP from one year to the next when no progress has been made is inappropriate).

Further evidence that APS failed to provide J.D. with a FAPE can be found by comparing other objectives for J.D.'s 2003–04 and 2004–05 IEPs. The 2004–05 IEP shows that J.D. had not mastered his written expression and his auditory processing skills as part of his receptive and expression in language functioning. Just like the math objectives, the goals and objectives of the 2004–05 IEPs in these areas are exactly the same as the 2003–04 IEPs. Compare # DRAPER–APS—00094 with # DRAPER–APS—00203 and # DRAPER–APS—00090 with # DRAPER–APS—00208. The objectives note that J.D. is to continue with the goal or that they were in progress. The 2004–05 IEP contains no recommendations to use assistive technology or specific programs for J.D. This would indicate that even though J.D. had not met his objectives under the 2003–04 IEP, APS continued with the same goals and objectives and reduced the assistive technology components of his IEP for 2004–05.[7] *See Kevin T. v. Elmhurst Cmty.*

---

**6.** Even if he had mastered math skills at the 5th grade level, the Court finds it hard to believe that J.D. advanced from the 5th grade level to the algebra level during the course of the 2003–04 school year.

**7.** However, the IEP meeting notes from No-

*Sch. Dist. No. 205*, No. 01 C 0005, 2002 WL 433061, at *10 (N.D.Ill. Mar.20, 2002) (finding that each IEP contains almost identical goals, objectives, and present levels of performance in violation of the IDEA which requires the school district to review and revise the IEPs at least annually to determine if the current IEP goals and objectives are sufficient to confer an educational benefit).

▬ APS argues that J.D. received some educational benefit because he received passing grades. The U.S. Supreme Court has cautioned that every handicapped child who is advancing from grade to grade is not automatically receiving a FAPE. *Rowley*, 458 U.S. at 202, 203 n. 25, 102 S.Ct. 3034 (confining analysis to the situation before it, in which the student was deaf but able to earn better than average grades in a regular classroom). Nonetheless, in the fall semester of his 2004–05 year, J.D. failed Literature/Composition, and he achieved below average marks in Computer Applications, Algebra I, and World History. He received average marks for Spanish and Biology. However, Ms. Haynes testified that during the next semester, J.D. was struggling in Spanish, and he failed his Language Arts and Algebra I courses. In addition, J.D. was graded on a sliding scale compared to his peers, and he received assistance in class. *See Nein v. Greater Clark County Sch. Corp.*, 95 F.Supp.2d 961, 977 (S.D.Ind. 2000). The Court must examine J.D.'s IEPs to ensure that IEP objectives are being met and that J.D. is not just advancing from grade to grade. *See Helms*, 750 F.2d at 825; *Kevin T.*, 2002 WL 433061, at *7. Therefore, J.D.'s passing grades in some classes are not dispositive of whether he was receiving educational benefits.

*Hall*, 774 F.2d at 636 (district court did not err in discounting student's promotions in light of school policy encouraging promotion and student's test scores and evaluations); *see Nein*, 95 F.Supp.2d at 978.

Based upon a preponderance of the evidence, the Court concludes that APS failed to provide J.D. with a FAPE for the 2002–03, 2003–04, and 2004–05 school years. APS failed to timely assess J.D. in the 2002–03 school year making it impossible for APS to design a proper IEP to meet J.D.'s unique needs. APS insisted on using the Lexia reading program even though J.D. was not making progress with the program. Finally, APS failed to design J.D.'s IEPs for the 2003–04 and 2004–05 school years to meet his individualized needs by failing to review and assess whether he had mastered his goals and objectives from the previous year and by failing to revise J.D.'s IEPs in certain areas from one year to the next.

**E. Remedy**

The ALJ found that J.D. was entitled to reimbursement of $11,000 for the costs his mother incurred at the SLC in 2003. The ALJ found that APS told J.D. that he needed to be reading at the 5th or 6th grade level in order to survive in high school, that APS could not provide services to get him to this level, and that he would have to obtain private services at his own expense to get to a 5th grade reading level.

▬ The Court may order school authorities to reimburse parents for their expenditures on private special education for a child if the Court determines that such placement is appropriate. *Sch. Comm. of the Town of Burlington, Mass.*

---

vember 2004 do indicate that J.D.'s speech therapist was working with him on language development, vocabulary, spelling, and comprehension, thereby indicating that APS was providing him with some assistance in these areas even if not specifically listed in the assistive technology section.

*v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2nd Cir.2005).

■■■ J.D. testified that he sought the services of the SLC from February to July of 2003. He further testified that he thought that the SLC brought his reading level up by two grade levels and he believed his mother paid $11,000 for SLC services. Although the Court respects the ALJ's educational expertise in this area, the Court concludes that the record does not support the award of reimbursement to J.D.'s mother for expenses incurred at the SLC. J.D. presented no documentary evidence of his program at SLC, making it impossible for the Court to determine if SLC's methodology and services were appropriate to meet J.D.'s educational needs. There is no evidence of the teachers who worked with J.D. or their qualifications. As for J.D.'s progress in the program, any progress J.D. might have made in the program is not enough in itself to justify requiring APS to reimburse his family and does not demonstrate that the placement

was appropriate to meet J.D.'s educational needs. *Berger v. Medina City Sch.*, 348 F.3d 513, 522 n. 6 (6th Cir.2003) (reimbursement does not depend on the "mere happenstance" of whether a child does well in private placement); *see Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 33 (1st Cir.2001). Finally, there is no documentary evidence that J.D.'s family actually incurred expenses of $11,000. For all of these reasons, the Court disagrees with the ALJ's conclusion and denies J.D. an award of reimbursement for his expenses incurred at the SLC. *K.C. v. Fulton County Sch. Dist.*, No. 1:03–CV–3501–TWT, 2006 WL 1868348, *16 (N.D.Ga. June 30, 2006) (denying reimbursement where student provided no evidence to demonstrate the appropriateness of the SLC program); *W.C. v. Cobb County Sch. Dist.*, 407 F.Supp.2d 1351, 1362–63 (N.D.Ga.2005) (finding no reimbursement where evidence showed private placement's methodology and certification were inadequate to meet student's needs despite fact that he had made progress in the program).

The ALJ further concluded that J.D. was entitled to compensatory services. The ALJ presented J.D. with two options.[8]

---

**8.** The options set out by the ALJ are as follows:

Option 1: He may choose to remain in the [APS] and, if this choice is made, he will be entitled to 60 minutes per day, five days per week, of intensive multi-sensory reading services provided by either the Sylvan Learning Center program or the Linda-mood–Bell Center program at J.D.'s sole election or at any other program agreed upon mutually by the parties. APS shall pay all costs of transportation to and from any such program. If J.D. desires such reading services to be provided elsewhere, his I.E.P. team must approve his request. Teachers in all of J.D.'s classes shall be trained in dyslexia including instructional strategies for a dyslexic student. A certified special education teacher shall be provided to J.D. for each of his classes and shall provide one-on-one instruction in conjunction with the regular teacher during the class to the extent J.D. requests it. At J.D.'s

election, at least one hour per day of tutorial services for J.D.'s classes shall be provided. At J.D.'s election, the tutorial services shall be provided during his study skills class, after school, or on Saturdays. No more than two hours of tutorial service are required to be made on Saturdays. J.D. shall also be entitled to extended services during the summer months which shall include the same services described above for the regular school year. During the first year, APS through J.D.'s I.E.P. team shall evaluate J.D.'s progress at least monthly and shall insure that appropriate testing to measure his progress is done at six month intervals by an independent evaluator selected by J.D. After the first year, APS through J.D.'s I.E.P. team shall meet at reasonable intervals and shall insure that appropriate testing to measure his progress is done at least annually by an independent evaluator selected by J.D. All services shall be provided at APS expense and shall con-

On March 28, 2006, J.D. informed APS that he selected Option 2 and identified three schools from which APS could choose: (1) The Howard School; (2) The Cottage School; and (3) The Brandon Hall School.

According to J.D.'s counsel, Mr. David Monde, APS refused to fund an independent evaluation for J.D. as provided in the ALJ's Order and required as part of the application process for both The Howard School and The Cottage School. Mr. Monde therefore arranged for Children's Healthcare of Atlanta to perform an independent evaluation. The Howard School further informed J.D. that it could not consider his application unless a psychological evaluation was performed by August 25, 2006. APS's counsel, Mr. Kevin Pendley, ignored Mr. Monde's request to pay for this evaluation, and Mr. Monde arranged for his law firm to pay for the evaluation so that it could be timely completed. Mr. Pendley ignored further requests to pay the necessary application fees, making J.D. unable to complete The Howard School application until two weeks into the school's fall term.

According to Mr. Monde, Mr. Pendley ignored his repeated requests to allow J.D. to enroll in all three private schools to ensure that he would receive academic ser-vices in August even if he were denied admission to The Howard School. Mr. Pendley finally responded to Mr. Monde and assured him that APS had spoken to The Howard School and had assurances that J.D. would be accepted there, making all other applications unnecessary.

On August 28, 2006, The Howard School denied J.D.'s application, stating that their program would be overwhelming for J.D. and that his academic needs outweighed their available personnel. They further recommended that J.D. seek placement at The Cottage School.

According to Mr. Monde, he relayed this information to APS and that J.D. sought placement at The Cottage School, one of the three schools he had originally selected in March. Mr. Pendley ignored J.D.'s request for APS to consent to this placement. Accordingly, Mr. Monde recommended to J.D.'s family that he apply to The Cottage School.

On September 13, 2006, Mr. Pendley wrote to Mr. Monde explaining that APS had reviewed the comprehensive program at The Cottage School and the proposed Enrollment Contract. APS declined to pay for anything but the base tuition of $17,850 and the $75 application fee for the

tinue until J.D. has graduated from high school with a regular high school diploma or until June 2009 whichever is earlier; or Option 2: If, in order to complete his high school education, J.D. desires a placement outside the [APS], J.D. shall provide to APS a list of three proposed private schools inside the State of Georgia to provide regular education and special education services for his dyslexia. APS shall choose one of the three schools 30 days from the date it receives the list. APS shall pay the costs of transportation to and from the school. APS shall pay for all reasonable costs to attend the chosen school which shall not exceed $15,000 per year unless APS agrees to pay a higher sum. J.D. shall be entitled to extended services during the summer months which shall include the same services provided during the regular school year. J.D. shall be entitled to these services until he receives a regular high school diploma or until June 2009 whichever is earlier. During the first year, APS shall pay for an independent evaluation at 6–month intervals to measure J.D.'s educational progress. J.D. shall have the right to select the evaluator. After the first year, APS shall pay for an independent evaluation at least annually to measure J.D.'s educational progress. J.D. shall have the right to choose the independent evaluator. APS shall pay the costs of all such evaluations. ALJ Order at pp. 36–37.

2006–07 school year; any other amounts would be the responsibility of the family.

J.D. argues that the ALJ erred in his remedy of compensatory services because neither Option is reasonably calculated to provide the educational benefits that likely would have accrued to J.D. from the special education services that APS should have supplied. J.D. claims that the APS Option is no option at all because the ALJ found that APS had forfeited the right to continue to educate J.D. As for the private school placement, J.D. contends that The Cottage School is prepared to provide J.D. with the benefits that APS has denied J.D. but that the cost of these benefits exceeds the $15,000 annual cap imposed by the ALJ. Furthermore, The Cottage School plan includes Supplemental Services as an essential component for J.D. but those services are not available to J.D. according to the options crafted by the ALJ. J.D. claims that there is no evidence in the record regarding the actual cost of private school. J.D. contends that the $15,000 cap is impractical and will preclude J.D. from receiving the full set of compensatory educational services to which he is entitled. J.D. also argues that the private school option is inadequate without speech/language services and psychological counseling, which the ALJ did not include as part of his remedy. J.D. contends that the ALJ erred by finding that he could order only three years of compensatory education (until 2009) and that the ALJ has placed an artificial limit on the remedy. J.D. argues that given APS's educational neglect of J.D., he may take longer than three years to obtain the educational benefits he was wrongly denied. Finally, J.D. asserts that the private school option is inadequate without the appointment of a Special Master, with expertise in educating students with dyslexia and J.D.'s academic deficits, who will advise the Court and compel APS to provide whatever future remediation J.D. requires.

APS argues in response that there is no evidence in the record of which private schools provide services that might be appropriate to provide J.D. with a FAPE. APS claims that the ALJ determined it was up to J.D., despite the fact that he had no training or expertise in educational methodologies or instruction, to choose the proper placement for him. APS contends that the ALJ failed to determine that private services were proper. APS argues that by offering J.D. the option of staying in the Atlanta Public School system, the ALJ necessarily determined that APS could provide J.D. with a FAPE, and therefore APS is not required to pay for private placement. As for the additional services J.D. now seeks, APS avers that J.D. has offered no basis on which the Court could determine that these additional services are warranted. APS asserts that J.D.'s request for a Special Master also has no support and that any appointment would add additional and needless layers of bureaucracy, complexity, and cost prior to the determination that the parties are unable to work cooperatively.

■■■ The Court may award educational services to be provided prospectively to compensate for a past deficient program. *Reid ex rel. Reid v. Dist. of Columbia,* 401 F.3d 516, 522 (D.C.Cir. 2005); *see Burlington,* 471 U.S. at 369, 105 S.Ct. 1996. "Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *G. ex rel. RG v. Fort Bragg Dependent Sch.,* 343 F.3d 295, 309 (4th Cir.2003). Appropriate relief is designed to ensure that the student is appropriately educated within the meaning of the IDEA and to provide the educational benefits the school district should have

supplied in the first place. *Reid,* 401 F.3d at 524. The Court has broad discretion to grant such relief as it finds appropriate. 20 U.S.C. § 1415(i)(2)(C)(iii); *Burlington,* 471 U.S. at 369, 374, 105 S.Ct. 1996. In fashioning equitable relief, the Court must consider all relevant factors and use a flexible approach to address the individual child's needs with a qualitative, rather than quantitative focus. *Florence County Sch. Dist. v. Carter,* 510 U.S. 7, 16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Reid,* 401 F.3d at 524. Compensatory awards should compensate, and this means that they must do more than provide "some benefit" as required by ordinary IEPs. *Reid,* 401 F.3d at 525. In short, compensatory education is necessary to preserve a handicapped child's right to a free education. *Jefferson County Bd. of Educ.,* 853 F.2d at 857.

 The Court agrees with the ALJ that J.D. is entitled to a compensatory award to compensate him for APS's denial of a FAPE for the 2002–03, 2003–04, 2004–05 school years. The Court finds that there is ample evidence in the record of the types of services J.D. will require to appropriately educate him within the meaning of the IDEA. Drs. Wolman, Dragan, and Bogen testified about the kinds of educational services J.D. will need based on his learning disability, even if they did not mention a particular school.[9] The Court finds that the ALJ's remedy of allowing J.D. to submit to APS a list of three private schools is appropriate. Although J.D. might not have the training to determine the best possible school for him, the ALJ left it up to APS and J.D. to work it out if J.D. chose the private school placement. It appears from the letter submitted by Mr. Monde that APS agreed to J.D.'s placement in The Cottage School but not to paying the full cost.

J.D. has submitted the affidavit of Dr. Jacque Digieso in support of placing J.D. at The Cottage School. Dr. Digieso is the Executive Director and co-founder of The Cottage School, a school and educational resource center for middle and high school students with learning disabilities and other special needs. In her thirty years of experience, Dr. Digieso has developed educational plans and strategies for more than nine thousand students with special needs. Dr. Digieso states that based on her review of J.D.'s school records and the independent evaluation completed in August 2006, it is apparent that J.D. has substantial academic deficits in particular areas which currently place him significantly behind his grade level. Like the experts who testified before the ALJ, Dr. Digieso notes that J.D. requires an intensive academic program with supplemental services and summer school sessions to overcome his deficits and his specific learning disability. Dr. Digieso states that she believes The Cottage School can meet J.D.'s academic needs. She has led a process by the school to create an educational program for J.D. consisting of regular enrollment in daily classes, which includes summer school for 2007, one-on-one tutoring, an after school enrichment program, and other necessary services. Finally, Dr. Digieso notes that piecemeal application of the elements of this plan would be practically certain to fail J.D. and that she could not in good faith permit J.D. to enroll at The Cottage School without implementing the program in its entirety. The cost of tuition and basic services for the school year and summer session is $21,265. The cost of the supplemental services recommended by Dr. Digieso is $12,885.

 The Court concludes that The Cottage School can address J.D.'s individu-

---

9. Dr. Dragan testified that he was familiar with both The Cottage School and The Howard School, mostly through their published material on the Internet.

alized needs and provide him with the services he needs to go forward to become an independent, capable, and successful adult. The Court finds that private school placement is appropriate but that the ALJ's $15,000 cap is arbitrary and impractical. Instead, the award must compensate and provide J.D. with the educational benefits APS should have provided to J.D. in the first place. In exercising its discretion to grant such relief as the Court deems appropriate, the Court finds that J.D. is entitled to the full services at The Cottage School including the supplemental services as outlined by Dr. Digieso in her affidavit.[10] APS shall pay for these services in full at a total cost of $34,150.00 per year.[11]

▆▆▆ The ALJ limited J.D.'s award of compensatory services until he receives a regular high school diploma or until June 2009, whichever is earlier. The ALJ issued his opinion in January of 2006. J.D. has been delayed in receiving educational services while this matter has proceeded through the administrative process.[12] Therefore, the Court amends the ALJ's Option 2 for J.D. to receive compensatory services until he receives a regular high school diploma or until June of 2011, whichever is earlier.

APS shall reimburse J.D.'s counsel and his law firm for the cost of J.D.'s independent evaluation conducted in August 2006 in accordance with the ALJ's Order. All other applicable provisions set forth by the ALJ in Option 2 shall remain in effect.

The Court denies J.D.'s request to appoint a Special Master at this time. The IDEA contemplates that parents and the school district can work together to enable a student to receive educational services. The Court believes the parties in this case are capable of working together to ensure that J.D. is enrolled at The Cottage School and receives the services he needs there. Furthermore, this order as well as the ALJ's Order set out the specific non-discretionary obligations of APS.

*Conclusion*

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART J.D.'s motion for relief from administrative order [# 19] and APS's motion for judgment on the administrative record [# 24]. The Court AMENDS the ALJ's Order—the compensatory award in Option 2 as well as the reimbursement of $11,000—as outlined above.

IT IS SO ORDERED.

---

10. J.D. requests specialized language/speech services and psychological counseling. It is not clear whether the plan that The Cottage School has proposed for J.D. includes these services. The Court limits J.D.'s award to the plan The Cottage School has proposed and not any additional services.

11. APS will pay for these services as well as any reasonable yearly increase in cost for these services not to exceed $38,000 per year for the required time period.

12. J.D. turned twenty years old on February 2, 2007. Nevertheless, compensatory awards allow a disabled student to continue beyond the age of twenty-one in order to make up for the earlier deprivation of a FAPE. *Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 250 (3rd Cir.1999); *see Jefferson County Bd. of Educ.,* 853 F.2d at 857.